GODFREY et al. v. POWELL et al.
(two cases).
Nos. 11201, 11279.

Circuit Court of Appeals, Fifth Circuit.
July 13, 1945.

Rehearing Denied Sept. 5, 1945.

In No. 11201:

Giles J. Patterson, of Jacksonville, Fla., for appellants.

F. P. Fleming, Olin E. Watts, Henry P. Adair, and Wm. H. Rogers, all of Jacksonville, Fla., Paul R. Kach, of Baltimore, Md., W. R. C. Cocke, of Norfolk, Va., and Thomas O'G. FitzGibbon, Edwin S. S. Sunderland, Leonard D. Adkins, and Jesse E. Waid, all of New York City, for appellees.

In No. 11279:

Giles J. Patterson and Albion W. Knight, both of Jacksonville, Fla., for appellants.

F. P. Fleming and Wm. H. Rogers, both of Jacksonville, Fla., W. R. C. Cocke, of Norfolk, Va., and Jesse E. Waid and Leonard D. Adkins, both of New York City, for appellees.

Before SIBLEY, HUTCHESON, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

These appeals relating to the All Florida Lines, while not directly from orders in Seaboard AirLine Railway reorganization proceedings, which have been approved by this court[1] and the Fourth Circuit Court of Appeals,[2] deal with one of the concluding phases of that reorganization in that the plan provides for the inclusion of the properties of the All Florida Lines in the reorganized Seaboard system through purchase by the Reorganization Committee at foreclosure sale at not less than a fair upset price. The foreclosure proceedings of All Florida have been matured and the properties were sold at foreclosure on September 1, 1944, to Seaboard Railway Company, which was organized by the Seaboard Reorganization Committee to effectuate the plan.

In these two causes on the docket of this court, five separate appeals are dealt with. Two of them are from decrees in cause No. 705 Equity, the ancillary receivership of Seaboard AirLine Railway Company.[3] One of these denied the request for modification of the orders[4] under which Seaboard receivers had been operating the All Florida Lines. The other awarded Seaboard receivers a paramount lien on the All Florida properties to secure repayment to them of amounts expended for additions and betterments aggregating something over two million dollars. Three of them are from decrees in Cause 707 Equity, a suit by the trustees to foreclose the mortgage given by All Florida Lines.[5] Of these, one upheld the right of the receivers

---

[1] Badenhausen v. Glazebrook, 5 Cir., 148 F.2d 450.

[2] Badenhausen v. Guaranty Trust Co. of New York, 4 Cir., 145 F.2d 40.

[3] The company having gotten into difficulties, receivers were, on December 23, 1930, appointed for its property by the Federal Court in Virginia, and the same receivers were appointed in Ancillary 705 by the Florida Court.

[4] After the disaffirmance of the leases under which Seaboard had been operating the All Florida lines, an operating agreement was made by the Seaboard receiver under the authority at first of order 13 and then of order 48 entered in the main receivership in Virginia and confirmed in the ancillary receivership in Florida. These orders provided in substance that the Seaboard receiver should receive all income of every kind and character and pay and be responsible for the payment of all operating expenses. Seaboard receivers were not to be obligated to pay the rental under the leases, pay any interest on the Seaboard of Florida bonds, or to account to All Florida or its receivers for the earnings, if any, derived from the operation of the lines.

All Florida and its receivers, on their part, were not to be chargeable or responsible to repay the deficits, if any, sustained by the Seaboard receivers from the operation of said lines. These orders and the operating agreement they authorized were to continue in effect until modified or vacated with the right to persons interested in the All Florida to apply on ten days notice for their termination or modification.

[5] These All Florida Lines have from Aug. 1, 1924, to Dec. 23, 1930, been continuously operated under leases as a part of the Seaboard System, and since by the Seaboard receivers under the terms of the operating agreement described in Note 4. These lines on August 1, 1925, executed and delivered to Bankers Trust Co., a first mortgage aggregating $33,505,000, Seaboard guaranteeing payment of the principal and interest of each of the bonds. Interest installments due Feb. 1, 1931, and subsequently, have been defaulted, principal was prematured on March 30, 1931, and has not been paid. The Seaboard's guarantee is also in default and the claims for breach of it have been adjudicated in the Seaboard receivership proceedings to

488

to hold and use and enforce on the same basis as any other holder the $24,543,000 of bonds they had bought on the authority of court orders as a part, and in aid, of the reorganization plan.[6] A second, the foreclosure decree, authorized sale of the All Florida properties under the mortgage and stipulated an upset price of $9,350,000. The third confirmed the sale to the Seaboard Railway Co., a company organized by the Seaboard Reorganization Committee to carry out the Seaboard reorganization plan, for the sum of $9,350,000 plus.

Appellants are holders of $855,000 face amount of All Florida bonds and certificates of deposit which they bought after March 1, 1943, the date when the receivers' offer to purchase bonds expired. In addition to the bonds they hold, appellants purport to have intervened for the benefit of the holders of the $7,659,000 of bonds not owned by the Seaboard, and though none of those holders have joined in the suit, appellants throughout have undertaken to speak for and represent them. They, therefore, urge upon us that this is not a case merely of persons buying into a situation after it had come to pass and trying, entirely in their own interest, to upset it, but a case brought for the benefit of all holders of bonds to obtain for them a fair distribution of the earnings and the proceeds of sale of the All Florida properties.

So urging, they have taken pains in their briefs, and particularly in oral argument, to make it clear that though some of the appeals are nominally directed at the foreclosure and confirmation decrees, the setting aside of the sale is neither asked nor desired. In their brief and oral argument, they make it clear that they do not attack as unfair the price at which the property was sold, nor do they seek a resale. Though they, in terms, vigorously attack the upset price as fixed by the court, they do not attack it as too low, but merely as wrongly arrived at. In the act of attacking it too they admit, as they are bound to do, that an upset price is in its nature provisional and interlocutory, and for guidance in making the sale, and that the sale effected and up for confirmation, the upset price as such passes out of the picture and all that is really for consideration is whether the price brought was sufficient and the sale should be confirmed.

If the appellants do not really object to the price brought, do not seek to have the confirmation set aside, do not seek a resale, what do they expect to accomplish by these appeals, what relief do they seek here? The brief, especially the reply brief, makes this clear. It is not relief against the upset price or the sale as such. It is the relief of the distribution to themselves and the bond holders they purport to represent of a

be without value. On Feb. 2, 1931, trustees of the All Florida mortgage filed in the Florida court in Cause 707, their bill to foreclose the mortgage, and the same persons who had been appointed receivers of the Seaboard were appointed receivers of All Florida.

[6] The facts with regard to the purchase of these bonds are briefly these:

To simplify and expedite reorganization of Seaboard, to preserve the unity of the Seaboard System, and to enable holders of leased lines securities to tender them at a fair and reasonable price in advance of adoption of a plan of reorganization, the Virginia Court, on Oct. 14, 1942, instructed the Seaboard receivers to issue invitations for tenders of All Florida bonds and of bonds of the other leased lines.

A price of $160.00 per $1000 bond was fixed on the basis of an estimate of the value of the properties secured by the bonds. It was not only a fair price, but a liberal price at that time to All Florida bond holders, and far higher than any price at which the bonds had sold during the receivership. The offer and the order authorizing the purchase provided that the bonds to be purchased would be kept alive

and would be held by the receivers for the benefit of the holders of Seaboard securities and claims who might have an interest in the funds used in the purchase of the bonds. The All Florida Company committee representing about $18,000,000 of the bonds agreed that the price was fair, and the trustee of the mortgage recommended the acceptance. Included in the purchases were $5,200,000 of pledged bonds, $4,000,000 or which had been pledged to Chemical Bank & Trust Co. and $1,200,000 to the Treasury.

The funds used by the receivers to purchase the bonds were all subject to the lien of receivers' certificates issued by the Seaboard receivers and to the liens of various Seaboard mortgages which were, and are, in foreclosure. Impounding orders were then, and are now, in effect entitling the trustee under the mortgage to have income derived from the properties segregated for their benefit. At the time of the purchases, receivers had no free cash not subject to liens of receiver certificates and mortgages, and the results of their operations of All Florida Lines to that time showed deficits.

larger proportion of the proceeds of the sale of the properties.

In their original brief, after pointing out that the appeals are five in number, appellants say, "But there is only one controversy before this court". In their reply brief, after stating, "All Florida lines were in default and a decree of sale was inevitable. A sale was made to Seaboard Railway Co., the reorganized Seaboard. It proposes to pay the purchase price in claims, liens, bonds and cash. The cash will be paid out of receivers' earnings." They pose the question thus: "Did the decree make an equitable distribution of the earnings, and the proceeds of the sale of the properties?" Declaring, "The court must first determine: (1) the principles of equity that should control distribution; and (2) the amount of money available for distribution," they make it clear that if the question posed is answered in the affirmative, the decrees should all be affirmed. If, in the negative, they should be modified accordingly. They make it clear, too, that the answer to this question is to be found in the answer to the three subordinate questions which make it up: (1) Was the district judge right in denying their claim that the All Florida bonds purchased by the receivers should be subordinated altogether, or at least limited in participation to the amount paid for them? (2) Was he right in denying their claim that the additions and betterments made by the Seaboard Receivers were for the benefit of Seaboard, and they should not be, therefore, awarded a lien for the amount thereof? And (3) was he right in denying retroactive or prospective modification of the operating orders, and, therefore, their claim to All Florida earnings?

■ We answer these questions in order. As to the first, the bonds purchased by the receivers, we are in no doubt that it was correctly decided. As to all the $24,543,000 of bonds purchased by the receivers, including the $5,200,000 which had been pledged by Seaboard and purchased from the pledgees, who had acquired them under the pledge, appellants' case on this issue proceeds primarily on the unfounded assumption, in the face of the facts of, and of the orders authorizing and giving character to, the purchases (note 6 supra), that the bonds were purchased with profits from operation of, and, therefore, with funds belonging to, All Florida, and that in effect they were not purchased but paid, or that the funds were those of Seaboard and the holders of All Florida securities were entitled on what is called "the instrumentality rule"[7] to have them subordinated. The principle invoked is not applicable, for the bonds were not bought with All Florida funds nor with funds belonging to Seaboard, or under its control. They were bought with funds of security holders of Seaboard under orders directly authorizing the purchase and with results contemplated and provided for in the orders. No applicable, legal, or equitable principle called to our attention or known to us supports the theory of appellants that in some way an injury has been done to the holders of bonds, who were unwilling to sell, by the purchase of bonds from others, who were willing to sell. The record contains no evidence which, if the theory were sound in law, would support it in fact. The funds which were used to purchase the bonds were funds belonging to creditors of Seaboard, they were not Seaboard funds, nor were they funds in which All Florida bond holders had any interest. The price the receivers paid for them was fair and liberal, more than anyone had offered before, and no injury was done to those who willingly sold. Neither was any injury done to those who preferred to keep their bonds on the chance of a rise in value. The use of the purchased bonds in paying for the All Florida properties, rather than payment of the full amount in cash with a pro rata distribution to all bond holders, has not affected, it could not affect, the value of appellants' bonds, or the amount to be received by them from the proceeds of the sale. Appellants' claim that their bonds should be in effect paid in full would, if allowed, have the result of unjustly enriching the holders of the bonds who declined to sell at the expense of persons who bought from those who were willing to sell, expecting to succeed to their places.

We put to one side the untenable position of the active appellants in having bought into a situation for the purpose of attacking transactions which had taken place

7 Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 322, 618, 59 S.Ct. 543, 83 L. Ed. 669; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 518, 61 S.Ct. 675, 85 L.Ed. 982; Centmont Corporation v. Marsch, 1 Cir., 68 F.2d 460; In re Commonwealth Light & Power Co., 7 Cir., 141 F.2d 734.

before their purchase,[8] to consider the matter from the standpoint alone of the other bond holders. So considering it, we think no reason is presented or appears why any of the purchased bonds should be subordinated to the others or their participation in the proceeds of the sale at all limited.

In connection with the remaining questions, whether the district judge rightly allowed the receivers' claims for additions and betterments and rightly denied modification of the operating orders, appellees, while urging that the court did not err, insist that if there was error, it was harmless. Pointing out that though he did allow the additions and betterments claimed and did fix a lien for them, the district judge increased the upset price by the amount of these allowances, and though he did deny modification of the operating orders, he added $1,700,000 plus to the price because of the All Florida earnings on which the modification demand was based, appellees insist that he thus, in each instance offsetting an unfavorable with a favorable ruling, made harmless the ruling complained of. Appellants deny that this is so. As to the additions and betterments, they insist that their allowance was error to the extent of the $2,000,000 plus allowed, because before the claim for allowance as to them was made, they had been made upon, and had become a part of, the All Florida properties, contributing their worth to the value without regard to whether the properties were free of or charged with a lien. As to the refusal to modify the operating orders, they insist that, if error, the refund was not harmless but harmful because if the orders should have been modified retrospectively, the earnings to be distributed to All Florida bond holders would have been greatly in excess of the amount ordinarily allowed, and if modified only prospectively, they still would have been more than that amount.

We agree with appellants that it is no answer to their claim, that in the orders complained of the district judge erred, for the appellees to merely point out that he added to the upset price, and, therefore, the amount to be paid for the property, the amount allowed for additions and betterments and $1,700,000 plus because of

All Florida earnings. We do not agree with them, though, that in ruling as he did, the district judge erred. The evidence as to the additions and betterments shows without dispute that they were put upon the property, that the costs as claimed were reasonable, and that from the beginning of All Florida's operation under Orders No. 13 and 48, it was understood that the receivers reserved the right to make claim for additions and betterments to the property. Except as to $200,000 plus for the installation of Diesel shops and equipment at the Hialeah Yards, there was no evidence that they were not proper charges, and as to this disputed item, the district judge on ample evidence sustained the receivers' claim, that they were for the benefit of and chargeable to All Florida. It may not be doubted that the facts of which appellants seek to make so much, that the All Florida Lines are, and always have been recognized as being, a necessary part of, the Seaboard System, that Seaboard Receivers derived benefits from the operation and maintenance of the lines in good order, all have bearing upon the value of the All Florida Lines. But it equally may not be doubted that they are without significance upon the point sought to be made here that additions and betterments made with moneys belonging not to All Florida but to creditors of Seaboard should be held to have been given by these creditors to the All Florida Lines for the benefit of the holders of its bonds. Gifts of two million dollars in betterments and additions from bondholders and creditors of one railroad to the bondholders of another are not so easily made out. Appellants, realizing that this is so, point to the fact that the receivers did not make claim for additions and betterments until after the interveners had filed their suit, and that most of the expenditures were made ,after All Florida had commenced to make money, and insist that the claim of lien is an afterthought put up for the purpose of defeating their claims, that the additions and betterments were made and were intended to be made not out of money of Seaboard's creditors but out of the money of All Florida operations. We cannot agree that the evidence bears this contention out. On the record as a whole, it was within the sound discretion of the district judge to determine, as he

---

[8] Belden v. Burke, 147 N.Y. 542, 42 N. E. 261; Palmer v. Bankers' Trust Co., 8 Cir., 12 F.2d 747; Guaranty Trust Co. v. Chicago, M. & St. P. R. Co., D.C., 15 F.2d 434.

did determine, that the expenditures were made by the receivers of Seaboard with funds of the receivership, with the intention of claiming a lien for them, that they were entitled to make such claim, and that the claim should be allowed.

As to the operating orders and the district judge's refusal to modify them retrospectively, the orders leave in no doubt that if modified on notice, as it was provided in them they could be, the modification was to be prospective only, and there is no merit in appellants' demand that they be modified retrospectively. Appellants' claim for prospective modification stands better, but we think it quite plain that under all of the facts in evidence, it was in the district judge's discretion to determine whether they should or should not be modified, and that particularly since he allowed the appellants the benefit of earnings of $1,700,000, it cannot be said that he abused his discretion in denying the motion without prejudice to the right to renew it. For thirteen years, nearly every year of which was a deficit year, the operation went on under the orders not only without objection from, but with full acquiescence and agreement of, the All Florida mortgage trustee and the owners of its bonds, and no request was made for modification or change. Not until 1943, when appellants, having bought into the situation, made their present demands, was any claim made that changed circumstances required changed orders. At that time, while it is true that All Florida was making money as the result of war activities, having, according to one formula paid off the accumulated deficits and acquired a surplus, according to another, paid off most of the deficits, the foreclosure proceedings were pending and about to come to a head, it was established without conflict that a great part of the earnings had gone for taxes, and that in the years to come large sums of money would have to be laid out for improvements, maintenance, betterments and additions. The evidence standing thus, we cannot say that in an over all consideration of the circumstances, the district judge abused his discretion in denying the motion without prejudice to the right to renew it, while at the same time recognizing interveners' claim to the extent of increasing the value of the property $1,700,000 because of these earnings.

No reversible error appearing, the decrees are all affirmed.