**GUARANTY TRUST CO. OF NEW YORK et al. v. SEABOARD AIR LINE RY. CO. et al.**

No. 214.

District Court, E. D. Virginia.

Oct. 12, 1946.

See also 62 F.Supp. 207.

Parties asking for allowances, pro se.

W. Meade Fletcher, Jr., of Washington, D. C., for Reconstruction Finance Corporation.

CHESNUT, District Judge.

The Seaboard Air Line Railway has been in receivership in the District Courts for the Eastern District of Virginia (original) and the Southern District of Florida (ancillary) since December 1930. In December 1945, in expectation that the receivership would then shortly be terminated, the Receivers, Legh R. Powell and Henry W. Anderson, and their appointed counsel, W. R. C. Cocke and Harold J. Gallagher, filed petitions requesting additional compensation for their services during the fifteen year period. The Receivers also asked for an additional allowance to their auditor and chief financial officer, R. P. Jones. In the aggregate they asked for additional allowances in the amount of $1,355,000.

After customary notice to the parties in the cases, hearings were held in court on these petitions on December 19, 20 and 27, 1945, and September 18, 1946. Extended testimony was submitted by the Receivers and their counsel and numerous exhibits filed. At the conclusion of the hearings in December 1945 the court announced a ten-

tative conclusion that additional allowances in the amount of $250,000, to be later apportioned among the several applicants, would be made, but in view of the fact that this amount was very much less than the requested allowances, no final determination was then made. Since then, the reorganization of the Seaboard having been consummated on July 31, 1946, I have had opportunity to give further consideration to the problem presented. It arises under circumstances which make. the proper determination one of more than usual difficulty. To understand the situation some background review is necessary.

Legh R. Powell and Ethelbert W. Smith were first appointed Receivers of the Seaboard on December 23, 1930 by District Judge Groner in the District Court for the Eastern District of Virginia. Mr. Powell had been the president of the railroad. Mr. Smith was a vice-president of the Pennsylvania Railroad then interested in the Seaboard. Their compensation was primarily fixed at the rate of $50,000 a year for each. At the same time the court also appointed four counsel to the Receivers, Messrs. Cocke and Gallagher, and Messrs. Tazewell Taylor of Norfolk and Col. Henry W. Anderson of Richmond. The compensation of Mr. Cocke was originally ordered to be at the rate of $25,000 yearly, and that of Mr. Taylor and Col. Anderson $12,000 yearly for each. Mr. Gallagher's compensation was not at first determined but by later orders he has been paid at the average rate of about $24,000 yearly. Judge Groner was shortly thereafter appointed a Justice of the United States Court of Appeals for the District of Columbia and is now Chief Justice of that court. He was succeeded as District Judge in the Eastern District of Virginia by Judge Luther B. Way. Judge Way judicially supervised the Seaboard receivership until his regrettable fatal illness in October 1943, at which time further supervision of the Seaboard was assigned to the writer of this opinion.

For the first ten years of the receivership the financial condition of the Seaboard was such that no satisfactory plan of reorganization was possible although several efforts had been made to find one. In 1939 Mr. Taylor, having retired as one of the counsel to the Receivers, was appointed by Judge Way as special master to hold hearings and make a report submitting a plan of reorganization if possible. After very extended hearings at which various plans of reorganization were submitted by several of the parties or groups of parties in interest, Mr. Taylor filed a very elaborate printed report consisting of 283 pages and numerous annexed schedules with a recommended plan of reorganization including new capitalization and distribution of new securities among the secured creditors who were to participate beneficially in the plan. These included all the outstanding mortgage bond issues of the Seaboard with the exception of the Seaboard Adjustment 5's, which were subordinate in position to the Seaboard Refunding 4's, the claim of which could not be fully satisfied by the plan of reorganization. The report found that the Seaboard was insolvent and that there was no value in its then outstanding preferred and common stocks.

Very numerous exceptions to the master's report and plan of reorganization were filed by various parties in interest. The hearing on these exceptions began on October 25, 1943, and continued for about three weeks. For these hearings Judge Akerman of the Florida Court, who had supervised the ancillary receivership since 1930, and the writer of this opinion sat jointly. All the exceptants who appeared at the hearing were heard and opportunity was given to all security holders both of the Seaboard Adjustment 5's and of the stock interests to present any available evidence of then existing values in their securities, or other objections to the report. (No new or additional evidence of value was offered). As a result of the hearings the courts confirmed the master's plan of reorganization but with substantial modifications, especially with regard to distribution of the securities among those entitled to participate in the plan. A few of the parties prosecuted appeals in both the Fourth and Fifth Circuits where the orders of the District Courts were respectively affirmed and certiorari was denied by the United States Supreme Court in both cases (Guaranty Trust Co. et al. v. Seaboard

Air Line R. et al., D.C., 53 F.Supp. 672; 4 Cir., 145 F.2d 40; Badenhausen v. Guaranty Trust Co., 323 U.S. 797, 65 S.Ct. 440, 89 L.Ed. 636; Badenhausen v. Glazebrook, 5 Cir., 148 F.2d 450, 326 U.S. 733, 66 S.Ct. 42. See also Badenhausen v. Baetjer, 4 Cir., 146 F.2d 762, certiorari denied 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432; Blackford & Simpson v. Powell, 4 Cir., 151 F.2d 392, certiorari denied 66 S.Ct. 523, (Case 1); Guaranty Trust Co. v. Seaboard, D.C., 60 F.Supp. 607; Godfrey v. Powell, 5 Cir., 150 F.2d 486, 326 U.S. 779, 66 S.Ct. 272; Godfrey v. Powell, 5 Cir., 155 F.2d 51; Guaranty Trust Co. v. Seaboard, D.C., 62 F.Supp. 207; Dure v. Glazebrook, 4 Cir., 152 F.2d 756, 66 S.Ct. 1346 (Case 3).

It has frequently been stated, without being questioned, that the financial and legal structure of the Seaboard has presented the most complex situation with which the courts have had to deal in any railroad reorganization. The nature of the subject matter appears most fully in detail in the voluminous printed report of the special master, but will also be found more briefly summarized in the court opinions above cited, particularly D.C., 53 F.Supp. 672 and 4 Cir., 145 F.2d 40. An interesting historical account of the receivership will be found in the 198 page printed report of Special Master Marbury filed August 9, 1946.

The Seaboard Air Line Railway System consists of over 4,000 miles of track extending through six southeastern States, Virginia, North Carolina, South Carolina, Georgia, Alabama and Florida. Its physical and legal structure resulted from a process of extensions, consolidations and leases occurring over many years. That is to say, the System was built up piecemeal from time to time. At the time of the receivership in 1930 it consisted of fourteen subdivisions with ten separate underlying bond issues covering about half of the whole trackage; and four general mortgages, some a first lien on some of the mileage and second and third liens on other mileage. In 1930 the Seaboard had thirty-one subsidiaries, eleven of them leased to the Seaboard and ten separately operated. As of January 1, 1944, the capital indebtedness of the railway system including principal and interest was more than $300,000,000. All this indebtedness was prior to the then outstanding preferred and common stocks of the Railway and a certain additional but comparatively not large unsecured indebtedness.

The net revenues of the Seaboard System applicable to the payment of interest on securities in the first ten year period, 1930–1940, averaged a little less than $3,000,000 a year. It was obvious that this average net income was entirely inadequate to support a new capitalization equal to the then outstanding debt. It is true that the net income had materially increased in the three years 1941, 42 and 43, but this was due to the abnormal traffic created by the War which prior decisions of the Supreme Court had definitely stated could not be properly relied upon as the basis for new capitalization which must be approved by the Interstate Commerce Commission. Nevertheless the physical condition of the Seaboard System, including its running equipment for passenger and freight traffic as well as its road bed, had been greatly improved during the receivership by the wise expenditure of about $90,000,000 by the Receivers in betterments whereby its facilities and opportunities for greatly increased net revenues were much enhanced even during normal peace times. After giving consideration to all known and reasonably anticipated factors the reorganization plan provided a new capitalization of $196,870,000 consisting of outstanding Equipment Trusts in the amount of $11,870,000, new first mortgage 4% bonds, $32,500,000, Income or General Mortgage 4-½% bonds, $52,500,000 preferred 5% stock $100 par value $15,000,000 and 850,000 shares of new common stock, no par but taken at $100 par. It also provided (with respect to anticipated annual revenues) after allocating interest on the first mortgage bonds and equipments trusts, for a capital fund for betterments in the amount annually of $1,625,000; for a sinking fund for both the first and second mortgage bonds in the amount of $325,000 for the first and $262,500 for the second, all before the payment of dividends on the new stocks. Thus the total annual charges be-

fore dividends on the new capitalization would be $6,058,500, and a 5% dividend on the preferred stock would be $750,000 or a total of annual charges and dividends of $6,808,500 before dividends on the common stock. It was thought that the net revenues in normal times would be sufficient for all these payments and it was reasonably hoped that they would be sufficient in addition from time to time to warrant some dividends on the common stock.

We also now have the benefit of three years' hindsight from January 1, 1943. The new revenues for these three years amply confirm the estimate then made for the new capitalization even despite very substantial increases in operating costs due to increased wages and taxes in the last few years. There are too many uncertain factors presently existing to predict with any reasonable certainty the amount of net revenues for subsequent years. It is a matter of common knowledge that not only have wages been already greatly increased in 1946, but still greater increases may be asked by the railroad employees. In turn the Railroads are asking the Interstate Commerce Commission for higher traffic rates. Another important factor in the forecast is the rate of taxation which, for 1946, will apparently show some decrease as compared with the prior War years. Still another factor but of more temporary character is the rate of permissible depreciation of road and equipment for unusual amortization of war time facilities provided for under recent statutory authority.

The new proposed capitalization was at least tentatively approved by the Interstate Commerce Commission in 1944. The critical appellate litigation affecting the reorganization was not concluded until the United States Supreme Court denied certiorari in the Godfrey case, supra, affecting the acquisition by the Seaboard receivership through mortgage foreclosure of the Seaboard-All Florida Lines theretofore not owned but operated by the Seaboard Receivers. See Godfrey v. Powell, 5 Cir., 150 F.2d 486, certiorari denied, 66 S.Ct. 272. Promptly thereafter the Seaboard Reorganization Committee filed application with the Interstate Commerce Commission

for the final approval of the issuance of the new securities. This application was granted in a report of June 28, 1946. The reorganization has now been made effective as of July 31, 1946.

In their petitions for additional allowances the Receivers and counsel proceed on the theory that compensation payments heretofore annually made to them respectively were only payments "on account" and therefore now on the determination of the operating receivership the courts should make a survey of their services *over the whole fifteen year period* of the receivership and award additional allowances fairly commensurate with the nature and extent of the services respectively performed. They support their view of the matter by pointing to the fact that the previous annual allowances made by Judge Way over the thirteen year period that he supervised the receivership were expressed in the various orders to be "on account", without then final determination of all allowances. There was also evidence at the hearing apart from the expressed language of the orders, that the Receivers and counsel did expect additional compensation if the subsequent financial condition of the Seaboard and its successful reorganization warranted additional compensation. Some of the petitioners seem to present the view that the court should now make a completely detailed and meticulous review of the services performed over the whole fifteen year period, and to now determine the gross compensation for this whole period, deduct therefrom the prior annual payments on account and award additional compensation equal to the remainder. But after reviewing the orders themselves and with the benefit of the oral testimony now submitted, I am of the opinion that no such meticulous detailed appraisal is required although a fair and just determination of the present problem does include the larger aspects of the historical development of the receivership during the fifteen year period. In my opinion the proper interpretation of Judge Way's orders with regard to compensation is that the court then felt that the annual allowances made were reasonably adequate and sufficient for the work performed under the then respec-

tively prevailing conditions, but leaving open for future determination the possibility of *some additional compensation* if the subsequent financial condition of the Railway warranted it.

The principal light thrown on this question is to be found in a memorandum filed by Judge Way explaining the reasons for order No. 45 with respect to allowances then made to Messrs. Cocke and Gallagher respectively. This order was dated December 15, 1931, and it, with the memorandum, are to be found in the printed receivership record, Vol. V, pages 3803-12. Prior thereto, in September 1931, the then Receivers, Messrs. Powell and Smith, had filed a petition asking authority to increase the compensation currently payable to Mr. Cocke in view of his increased professional duties consequent upon the receivership; and also asking authority to pay compensation to Mr. Gallagher or his New York law firm of Hornblower, Miller, Miller & Boston, for professional services rendered from time to time in amounts determined reasonable by the Receivers. About the same time Mr. Gallagher submitted his request to Judge Way that for the nine months period he or his law firm should be paid $50,000 on account for services rendered up to that time. After notice and hearing Judge Way made order No. 45 which allowed Mr. Cocke compensation at the rate of $625 per month during the year 1931 in addition to the previous monthly compensation currently paid him, and allowed to Mr. Gallagher $40,000 for the year 1931. The order further provided as follows: "The court reserves for future consideration and determination upon any later application that may be presented whether, in the light of future developments in the receivership as they relate to increase or decrease of the Railroad's income and other matters of that character and such additional light as the future may throw upon the value of the services heretofore rendered, any additional allowance for such counsel, or either of them for services during the year 1931 will be made hereafter." In his accompanying memorandum Judge Way pointed out the then distressing financial condition of the Railway with the probability of serious loss to many investors in its securities, and the greatly decreased income of the Railway due to the then current economic depression and the memorandum concluded: "It was urged at the hearing that the allowance should be on account only and not final allowance for the year in question. While the court does not intend entirely to foreclose this question at this time *it does feel that as far as possible matters of this character should be settled as the receivership proceeds rather than postponed for determination at some indefinite time in the future."* (Italics supplied)

Subsequent orders passed by Judge Way also indicate quite clearly that he felt the current compensation paid from time to time was all that could consistently be allowed under the then respectively prevailing conditions; but that if the financial condition of the railroad materially improved further consideration would be given to requests for additional allowances. Thus in June 1932 (Receivership Record 4391) the compensation of the Receivers was reduced to $36,000 per annum and of their counsel, Messrs. Gallagher and Cocke, to $24,000 per annum, but with the reservation for further consideration of the question of compensation "in such future order or orders hereafter as the court may deem proper in view of the services heretofore or hereafter rendered and of all the circumstances of the case". And again on May 1, 1933, the compensation of counsel was further reduced to $22,500 per annum with a similar reservation as to future orders. Again, effective beginning March 1, 1933, Mr. Powell's salary as Receiver was reduced to $30,000 per year (Receivership Record 5030). On October 1, 1943, Judge Way on his own initiative filed a further order increasing the annual compensation of Mr. Powell as Receiver to $40,000 a year in view of the then substantially improved financial condition of the Receivership. It will be noted that Judge Way then made no further order for increase to counsel, but in March 1944 upon the request of the Receivers' counsel (by my order) their monthly compensation currently was restored at the rate of $25,000 per annum with similar reservation as to future compensation.

The present applications of the Receivers and their counsel for *some* additional compensation are quite consistent with the prior orders upon the subject. The financial condition of the receivership is very different now from what it was for the ten years 1931-1940. For that period the total Railway operating revenues averaged less than $40,000,000 per year. For the succeeding five year period, 1941-45, the average per year has been about $110,000,000. The average net income in the ten year period 1931-1940 was slightly less than $3,000,000. For the succeeding five year period the net has averaged about $20,000,000 per year. These great increases were, of course, primarily due to the temporary abnormal war conditions, which, however, have imposed on both Receivers and counsel additional burdens and responsibilities. Looking at the situation in its major aspects (and subject to some exceptions hereafter noted) I think it may well be said that the compensation paid to the Receivers and their counsel up to 1941 was reasonably adequate in view of all then existing conditions. But the last five years shows such a material change in the conditions that some additional compensation should now fairly be awarded to them.

 The question is what will be fair and reasonable in all the circumstances. The principles to be applied in determining this amount are, I think, well settled. I have heretofore considered them carefully in other corporate reorganizations under section 77B, now Chapter X, of the Bankruptcy Act, 11 U.S.C.A. §§ 207, 501 et seq. See In re Davison Chemical Co., D.C.Md. 14 F.Supp. 821; In re Kelly-Springfield Tire Corporation, D.C., 13 F.Supp. 724, 729. Receivership and bankruptcy cases should be administered as economically as reasonably possible and therefore allowances for services performed by court officers must be just but nevertheless *moderate* rather than *generous*. See the opinion of Circuit Judge (later Justice) Brewer in Central Trust Co. v. Wabash R., C.C. Mo., 32 F. 187, an early railroad reorganization case (1887). In determining reasonable allowances in accordance with these principles and especially with respect to what constitute proper allowances to lawyers there is no uniform mathematical formula to be applied. There are many factors entering into the determination of reasonable counsel fees when they must be fixed by the court. Integrity, capacity and industry of counsel are to be presumed, unless there is evidence to the contrary. Assuming the existence of these, probably the most important factors are (1) the nature, importance and responsibility of the duties performed; (2) the amount of professional time necessarily required for the services and (3) the result obtained.

In the instant case the ability and industry of both Receivers and counsel and their harmonious and effective cooperation have been observed and noted by Judge Way and by myself and in their respective fields all of them are men of exceptional experience and ability. Throughout the whole period of the receivership their services have been given freely and without stint to the advancement of the receivership interests. The nature of the problems with which they have had to deal was generally of high importance. The volume of their work is impressively demonstrated by the printed receivership record now consisting of thirty-two volumes containing in the aggregate about 30,000 pages of printed matter. Some indication of the extent of the current work of the receivership is found in the fact that in a little more than two years last past the Receivers by their counsel have filed and had court hearings after notice on more than 100 *separate written applications* for orders of court, many of them including numerous matters of importance involving purchases of equipment and real property, traffic arrangements, leases and other matters of railroad operation. These hearings, exclusive largely of others on reorganization problems, have required the presence and attention of the Receivers or their counsel or both on about fifty separate days. But even this cold printed record does not fully evidence the gravity and intensity of their fifteen years service to the receivership. Through no fault on their part the financial results of the first ten years of the receivership were indeed meagre but the foundation which they then laid in the improvement of the physical

plant and equipment of the railroad and the development of its good will by wise managerial policies has borne fruit in the materially improved financial condition in the last five years as a result of which the Seaboard has been able to take its place as one of the important transportation systems of the southeast and as such has discharged its proportionate burden in the successful promotion of the war effort.

It is impracticable to attempt now to summarize even the major activities of the Receivers and counsel. The major aspects, however, have been sketched in the testimony given at the hearings in this case by Col. Anderson and in the supplemental memorandum filed by Mr. Cocke, and in the other voluminous data and exhibits filed by Mr. Gallagher as a part of his testimony. In the early days of the receivership the financial problem was extremely pressing and difficult. Large amounts of taxes had to be met and were finally met by the issuance of Receivers' Certificates. The Equipment Trusts in large amount were in default and were successfully refinanced at lower rates of interest by more Receivers' Certificates. The operation of the many leased lines had to be separately provided for by negotiation, settlement and court orders. To keep the Railway system intact as a going concern was the most critical problem and one which was achieved only as a result of excellent financial experience and judgment and negotiations with many diverse interests. About $90,000,000 has been expended in betterment to the road and equipment; and $100,000,000 of capital indebtedness of the system has been retired by the expenditure of about $65,000,000. No doubt it would have been desirable to retire even more of the debt (when the market prices were low) if more cash had been available for that purpose. It is true the abnormal income during the war period has presently largely alleviated these financial difficulties; but if the problems of the early days had not been successfully surmounted the present comparatively fine results could not have been obtained. These particular problems were more especially the responsibility of the Receivers, but in meeting them they also received valuable aid and assistance from their counsel; and financial advice from some of the committees of bondholders.

As to the legal aspects and complications confronted by counsel, it may be observed that any one even superficially familiar with the operation of a railroad with trackage of more than 4,000 miles and operating in six different States, knows that even when the railroad is solvent and operating under its own management there must be and are constantly arising many difficult legal problems; and when a railroad becomes insolvent and unable to pay its debts and goes into court receivership these problems are greatly magnified both in amount and intensity. And especially was this true in the case of the Seaboard with its highly complex legal and financial capital structure.

At the hearings on these petitions the Receivers and counsel respectively submitted their estimates of further reasonable compensation. Thus Col. Anderson suggested that $250,000 additional would be appropriate for his services during the whole period; Mr. Powell has suggested a similar amount; Mr. Cocke requested an additional allowance of $120,000, while Mr. Gallagher asked for $635,000 additional. Although the parties to the case had been notified of the hearings and of the amounts requested, only counsel for the Reconstruction Finance Corporation appeared in person to oppose the petitions. The RFC is acting as the representative of the United States Government as a large creditor of the Seaboard, being pledgee of securities for a balance of loans made many years ago and now outstanding in principal to the amount of about $14,000,000. In the reorganization plan the United States as holder of these securities will receive new securities of some bonds and over 100,000 shares of the new common stock. It expressed the view that the further allowances requested were excessive. On the other hand, several of the interested security holders or their representatives expressed the view that the results of the receivership and prospective reorganization were now so favorable that they thought the Receivers and their counsel should be liberally and generously rewarded. At the

312

conclusion of the hearings in December 1945 the court rendered an informal oral opinion to the effect that under the then existing conditions some additional allowances should be made but that at that time the court was not prepared to authorize more than a further aggregate sum of $250,000, reserving final determination pending more mature study of the testimony and exhibits. An order to this effect was subsequently made.

It is perhaps not surprising that with the exception mentioned the Seaboard security holders who were entitled to participate in the reorganization plan have not actively intervened to aid the court in the determination of further just allowances. They have been unquestionably greatly benefited as a result of the conduct of the receivership and the advance of the reorganization plan. During the receivership and the progress of the plan the aggregate market value of their securities has increased by about $100,000,000. Even now the aggregate market price of the securities entitled to participate in the plan does not equal the whole principal and accumulated interest on the securities so entitled, but it does represent a very great financial betterment to all these security holders. If the court were to proceed on the principle of rewarding court officers on the basis of a quantum meruit for the value of the results obtained to the security holders, even the large amount now requested would not seem greatly excessive in view of the results obtained. But there are important other considerations which the courts must apply in matters of this kind. It must be remembered that the petitioners are acting as court officers in a receivership case where losses have been incurred even by most of the benefited security holders and where very great and substantial losses have unavoidably occurred with respect to junior securities which are not entitled to participate in the plan by reason of the insolvency of the railroad. The petitioners were not employed by the security holders but appointed by the court in the public interest and in accordance with principles that require economical administration. While the cash funds in the receivership are now ample to pay presently even the large allowances asked for, a dominant consideration for the court is the public interest in the continued successful operation of the raiload. Whatever additional allowances are made must come from a fund which would otherwise be reserves or working capital for the reorganized railroad. Though the present financial conditions are comparatively eminently satisfactory the financial future of the Seaboard and other railroads is by no means certain. It is a matter of common knowledge that in the last few years particularly there has been a great increase in taxation, both Federal and State, and very great proportionate increases in wages of employees. As Col. Anderson himself has well pointed out, the matter must be considered from the standpoint of (1) the public interest; and (2) the thousands of railway employees, as well as (3) the bond and stockholders of the new Railroad. In looking at the situation as a whole we may well take into account in retrospect the limited compensation in the lean prior years, but we must not overlook future uncertainties.

In accordance with these considerations I have reached the conclusion that the sum of $250,000 in the aggregate (as heretofore approved and ordered to be made as payment on account) will be just and reasonable additional allowances for the services of the petitioners without further increase of that sum. Even this amount may possibly appear to be large to persons not acquainted with the extent, importance and success of the services rendered. It must be remembered that the total sum is to be apportioned between five different officers and is made principally in recognition of (1) the greatly improved financial condition of the Seaboard receivership during five years last past and (2) the increased responsibilities and labors of the officers during the war period and (3) the successful result of their long activities in the first ten years of the receivership when their compensation was necessarily limited. During the last five years the Receivers have received and disbursed or retained as reserves over $550,000,000 of gross revenues, and have established the Seaboard Railway as one of the best transportation systems in the southeast. As I

have observed and learned, the whole re-ceivership despite the great original difficulties, financial, legal and physical, has been conducted with great ability and success both by counsel and Receivers. It is evident, I think, that they are entitled to some material recognition for their efficient management, both practical and financial. And it is apparently the wish of the security holders, almost without exception, that this recognition should be given.

There remains to be decided the fair and just apportionment of this aggregate additional allowance among the five officers. This also is a difficult problem for the court. In making this apportionment I wish it to be understood that the court has considered many factors in the problem, and the amounts severally allotted are not to be regarded as mathematically a measurement or estimate of the relative importance of the respective services or the contributions severally made by these officers to the receivership estate. Nor is the total amount so allowed to be considered as an appraisal or estimate of the fair worth of the services over the fifteen year period made on the basis of the intrinsic value of similar services in private employment. The allowance is made to court officers appointed in the public interest to assist judicial administration which, in receivership and bankruptcy matters, is required to be economical.

■ I consider first the case of Receiver Powell. Before the receivership he had been acting as president of the Seaboard Air Line Railway with an annual salary of $50,000. On his original appointment as a Receiver his compensation was continued at the same rate. A year later it was reduced to $40,000 per year and then from 1934 to 1942, both inclusive, further reduced to $30,000 a year. In 1943 it was increased by Judge Way to $40,000 and has remained unchanged since then. To January 1946 the aggregate paid him as compensation was $512,991.85, plus $4,200 for particular services as Receiver of two small roads constituting a part of the Seaboard System. He has also acted without compensation as Ancillary Receiver of the Seaboard in the Fifth Circuit and as

one of the Receivers of the leased Seaboard-All Florida Lines. His duties as Receiver have occupied his full time. He has been the chief operating officer of the System. His services have been uniformly commended and the court has heard many expressions to the effect that it was hoped he will continue in that capacity for the reorganized railroad. During the long lean years of the receivership he has given his services at substantially decreased compensation cheerfully and without personal complaint. I allocate $40,000 as his proportion of the additional allowance now made.

■ Colonel Henry W. Anderson is a Richmond lawyer who has devoted the major activities of his long professional life to the legal and financial problems of railroads. He is an outstanding American lawyer in matters affecting railroads. He has been engaged in numerous railroad reorganizations in recent years. His professional earning capacity is reasonably stated to be $100,000 a year. His contribution to the Seaboard receivership has been of the highest order. Without his personally seeking it, he was named by Judge Groner as one of the counsel to the original Receivers, and two years later upon the retirement of Mr. Smith he, against his own wishes and inclination, was persuaded by Judge Way to become one of the Seaboard Receivers. Again without his personal initiative, Judge Way fixed his compensation at $24,000 a year. And this has not been changed during the thirteen succeeding years. It is clear that in accepting the appointment and continuing to act for thirteen years as a Receiver of the Seaboard Col. Anderson was motivated by considerations of public rather than personal or pecuniary interest. His services have clearly been given at a compensation which represents a personal pecuniary sacrifice to himself as compared with what would normally have been his professional fees rendered in private services. His wide financial and legal experience in railroad affairs has been largely responsible for the ability of the Receivers to keep the Seaboard System intact in the public service during a long

314

period of great financial stringency affecting it. His acquaintance with railroad management generally and his knowledge of proper public relations of the railroad has contributed to the largely increased good will of the Seaboard by the adoption of improved methods of passenger transportation and the voluntary initiation of reasonable rates to attract railroad patronage.

In 1937 after prior unsuccessful efforts to plan a reoganization of the Seaboard, Col. Anderson was requested to take the initiative in preparing a plan. Reluctantly he did so and for more than a year gave intensive study to the problem and proposed a plan which, however, was not then adopted probably owing to the still unsatisfactory revenues of the Seaboard. Some of the features of his study of the subject, however, proved of value in the reorganization plan subsequently approved. Col. Anderson estimates that he has given about one-half of all his professional time to services of the Seaboard. As counsel for two years and as Receiver for thirteen years he has received an aggregate compensation to December 31, 1945, of $336,-000. His law firm in Richmond had for years prior to the receivership been district counsel for the Railroad and continued thereafter in the same capacity during the receivership for which they have been paid for the fifteen years services $47,967.-58 for fees. For some years of the receivership Col. Anderson also had the assistance of one of his junior partners, Mr. George D. Gibson, appointed as assistant to the Receiver, for which aggregate compensation has been paid of $14,100. In addition to this Col. Anderson also received (as did Mr. Powell) $4,200 for compensation in related receivership matters. During the last seven months of the operating receivership in 1946, he has been required to spend nearly all his time in current receivership activities and in hearings before the Interstate Commerce Commission and congressional hearings and matters of the completion of the reorganization. In view of all the circumstances I allot $80,000 additional compensation to Col. Anderson.

Mr. Cocke was appointed General Counsel of the Seaboard in 1929. Theretofore he had been a trial lawyer in Birmingham, Alabama, a member of a law firm which had been district counsel for the Seaboard. His salary as General Counsel was put at $25,000 a year with the expectation held out by Mr. Powell, the then president of the Seaboard, that if conditions were satisfactory he could reasonably anticipate some increase in compensation. Unexpected then, the receivership followed in about a year, and Mr. Cocke has been retained as General Counsel since then without increase in basic salary. As General Counsel he has been principally in charge of all the commonly current legal affairs of the Railway and has supervised the legal department at Norfolk and legal matters arising with district or local counsel in the six States, of whom there are over one hundred. The Norfolk legal department consists normally of ten or twelve assistants including a general solicitor; but for some part of the war period the office has been unavoidably vacant thus depriving Mr. Cocke of that assistance and relieving the receivership of some portion of the annual salary of $15,000 for the position.

As previously indicated the problems of the receivership have greatly increased Mr. Cocke's duties and responsibilities during the whole period of the receivership. He has briefed and argued many cases in the district and appellate courts of both the Fourth and Fifth Circuits, and a number in the Supreme Court of the United States. He has summarized in a memorandum the more important of these cases with references to the reported decisions. During the past few years I have had occasion to notice closely and appraise as excellent much of his major professional activity in Seaboard litigation. His court work is of very high order in careful preparation and clear exposition. If his compensation were to be measured on a piece work basis, I would consider it justified a considerably larger allowance than I feel able to make. But it must be considered that he has been largely employed on an annual salary which, according

to the evidence in the case, is fairly commensurate with the amount of salaries paid to the general counsel of comparable railroads, not in receivership. It is also to be remembered (unlike the case of Mr. Gallagher next to be dealt with) that Mr. Cocke's annual compensation is net, with all office expenses paid by the employer. In all the circumstances I consider $40,000 to be a reasonable and just additional allowance to be made to Mr. Cocke.

█ Mr. Gallagher's petition requires more extended discussion. He asks for an additional allowance of $635,000. In any aspect of the case the amount seems unreasonably large to me.

The reason for this large requested allowance is put by Mr. Gallagher as follows: After graduating from the Harvard Law School he became associated with the New York law firm of Hornblower, Miller, Miller & Boston before 1920. Shortly thereafter the firm became counsel in a large receivership case affecting the Brooklyn Transit Company and as a junior in the office, Mr. Gallagher had valuable professional experience in a complicated local transportation receivership case. His firm was also counsel in other railroad receiverships or reorganization matters in which he acquired further extended experience. For some years prior to 1930 his firm had been advisory and financial counsel to the Seaboard Railway and had received gross fees for some years of about $65,000 a year. At that time the Seaboard maintained general offices in New York City at a cost said to be about $100,000 a year. Mr. Gallagher had given much personal attention to Seaboard matters. When the Seaboard receivership occurred it was at the request of Mr. Powell that Mr. Gallagher was named as one of the counsel to the Receivers. His rate of compensation was not fixed by the original order and he apparently thought that his designation as one of the counsel would carry with it the general prior relationship of his firm to the Seaboard. The first order by Judge Way with respect to his compensation came about as heretofore stated in connection with Order No. 45. At that time Mr. Gallagher asked Judge

Way to allow him or his firm $50,000 on account for services for the first nine months of the receivership. Judge Way reduced the amount to $40,000 with an explanatory memorandum of the reasons therefor. Mr.Gallagher testified that at the time he told Judge Way that while he was asking for only $50,000 he thought the fair compensation would have been $65,000 and, as previously stated, thereafter Judge Way passed orders to the effect that Mr. Gallagher's compensation should be $24,000 a year. Even this was followed by a further 10% deduction apparently voluntarily taken by various Seaboard officials for a certain period owing to the limited revenues. From 1934 to 1943, both inclusive, Mr. Gallagher received compensation at the rate of $22,500 per year. For 1944 and 1945 he has received $25,000 a year. In the period of the receivership he has received in the aggregate $379,458 to July 31, 1946.

The principal basis urged by Mr. Gallagher for the present requested additional allowance is a time account which he has submitted in itemized detail which sets forth day by day for the whole period of 15 years and seven months the time spent either by himself or other members of his office, senior partners, junior partners or associates, on Seaboard legal matters. The aggregate of all this time so charged is about 40,000 hours. Mr. Gallagher says that the customery rate of charge for the time of partners of his firm (now Willkie, Owen, Otis, Farr & Gallagher) is $50.00 an hour for the time of senior partners with smaller amounts for junior partners and assistants, averaging about $25.00 an hour generally for work done in their office. His estimate is that he has personally spent about half of all his professional time during the 15 year period on Seaboard matters and that other members of his office, principally the junior partner, Mr. Carroll, have spent what is equivalent to the other half of Mr. Gallagher's time during this period. His computation is that through himself his firm should be compensated at the rate of $25.00 an hour for all this time, or at about $1,000,000 for the whole period. He deducts the amount heretofore paid to

him and thus obtains the remainder of about $635,000 now asked for. He urges that this is reasonable compensation for a first class New York law firm and points to the fact that his firm has been allowed an equivalent rate of compensation in other receivership matters in New York. He also points out, as is undoubtedly true, that all large New York law firms have heavy overhead expenses which he estimates to be at an average of about one-third of the gross fees received. It may also be noted that Mr. Gallagher's appraisal of $1,000,-000 for fifteen years services is at the rate of about $65,000 a year which again would seem to indicate that Mr. Gallagher's thought in the matter is that his firm should be compensated for Seaboard matters for the whole 15 year period on about the same basis of the fees received by them from the Seaboard prior to the receivership. And it may be said that it is quite possible that the Receivers, Messrs. Powell and Smith, had this original idea of Mr. Gallagher's relation to the Seaboard as will appear from their petition in September 1931 which has been referred to. But my own interpretation of Judge Way's orders is to the contrary. My independent view is that the basis of compensation requested by Mr. Gallagher is not a proper one to be acted on by this court.

There are other considerations which seem to me to support my view of the matter as the proper one. Mr. Gallagher's time charge of 40,000 hours was correctly stated by him to be exclusive of the professional attention given to other special Seaboard matters by his firm. I find from data furnished by the Receivers that in addition to the $379,458 paid to Mr. Gallagher personally the Seaboard Receivers have also paid to his firm over the 15 year period additional fees for special services in particular cases amounting in the aggregate to $323,190. Some of these special fees were as follows: Citrus Division 'Case (an Interstate Commerce Commission Case) $17,500; preparation of Equipment 'Trusts, $29,500; personal injury loss and damage claims and miscellaneous litigation in New York as local counsel, $22,445; Seaboard Air Ways, Inc., $15,000; for in-come tax matters $113,500; Baltimore Steam Packet Co., $105,750; Macon, Dublin & Savannah rate and tax case, $12,500; Tampares & Gulf R.R. Co. 1st Mtge. Bonds, $4,000; Tampa Union Station Co. Refinancing Company's 4% Bonds, $3,000. In relation to the matter of general office overhead expense, it may also be noted that during the 15 year period the Seaboard Receivers also paid to Mr. Gallagher's firm $31,136.51 for reimbursement for stenographic services.

There is no suggestion here that any of these fees paid to Mr. Gallagher's firm in the special matters were unreasonable or more than fair compensation in any respect; and it also appears that these special services were doubtless necessary and to the advantage of the receivership. But it is, I think, quite inferable that in determining Mr. Gallagher's compensation as counsel for general receivership matters from time to time during the 13 year period Judge Way was aware of these special employments and substantial fees being paid to Mr. Gallagher's firm in various matters. A not unreasonable point of view would seem to be that the annual salary paid to Mr. Gallagher was in the nature of a retainer for his services from time to time for general matters and that his firm should be employed for special matters for additional compensation.

The time charge of 40,000 hours against general receivership matters has been examined and some analysis made of it. Mr. Gallagher estimates that he spent half of his whole time on Seaboard matters. An analysis or break down of the time shows that Mr. Gallagher personally spent 12,-721½ hours of the aggregate 40,000 hours, while his junior partner, Mr. Carroll, spent 14,702 hours, with more than 9,000 hours spent by associate lawyers and the balance by others of the firm. It would seem from this that only about one-third of the 40,000 hours charged is Mr. Gallagher's time personally.

If we were to determine a reasonable allowance merely on the basis of time spent, it appears that the time actually spent by members of Mr. Gallagher's firm on general receivership matters for which

he has been paid $379,458, would be at the rate of a little less than $10.00 an hour for the whole time charged. This rate would be inadequate compensation for similar services rendered to a private client. But on the other hand, the analysis of the time charge account indicates that $25.00 an hour uniformly applied to the whole account would be unreasonably large. About one-third of this aggregate time was given by Mr. Gallagher personally. About two-thirds was given by junior partners or associates in the firm. At the beginning of the receivership Mr. Gallagher was himself a comparatively young man of thirty-five years of age and presumably not then a senior partner. And nearly two-thirds of the work was done by even younger men in the firm. While very much of the work was important, a great deal of it was necessarily about comparatively minor matters. While there is undoubtedly great advantage to a general client in having available a wide range of expert services furnished by a large New York law firm, there is bound to be a certain amount of duplication of work in detail. Even more importantly the time charged to the general receivership work cannot fairly be entirely dissociated from the special cases on which the firm was employed and received large additional fees. Over the 15½ year period the firm has been paid over $700,000 for all classes of work, or at the rate of about $45,000 a year. And it may be noted that the time charges of the firm with respect to the several special matters tend to show that the fees charged therefor were at a considerably less rate than $25.00 an hour. And it is fair also to bear in mind that the ten year period of the 30's was, owing to general economic conditions, one in which lawyers as a class were not so fortunate with respect to fees as prior and subsequent thereto. Looking at the whole situation it does not appear to me that Mr. Gallagher and his firm were greatly undercompensated during this ten year period for their services rendered to the Seaboard. But as I have said, the situation in the last five years is quite different.

In this discussion of Mr. Gallagher's situation nothing is intended to belittle or minimize the value of his professional services to the receivership. He is a lawyer of great ability and exceptional experience in important receivership cases. When this receivership first occurred his experience with prior receivership matters was of great value for his quick grasp of the situation and the many things that immediately had to be done, and throughout the whole period his services have continued to be highly efficient and have been most freely given even sometimes to the prejudice of his personal health in consequence of very intense work. It is apparent from the testimony that his acquaintance with receivership matters led to his original appointment as one of the counsel for the Receivers, and thereafter he was the one to whom they naturally turned to effectuate the legal requirements for particular emergencies as they arose from time to time. As expressed by Mr. Joseph France of counsel for the Underlying Bondholders and now one of the Reorganization Managers, who, for many years has been most intimately familiar with Seaboard affairs, Mr. Gallagher was the "wheel-horse" in the officers' co-operative efforts.

Mr. Gallagher relies on the importance and quality of his work as well as on the time charged to it on the books of his firm. He has submitted elaborate and lengthy briefs reviewing the many important questions to which he gave attention during the whole period. He perhaps naturally enough stresses his personal contributions in all these matters. Read by itself his review of his work is impressive as to both quantity and quality. But the overall picture must also be considered. He was only one of the many lawyers working on Seaboard matters, and the result was necessarily much duplication of effort. Thus in connection with Mr. Gallagher's testimony and exhibits, there should be read the testimony and summaries of their activities by Colonel Anderson and Mr. Cocke, and also the more disinterested and impartial general survey of the history of the whole receivership in the excellent summary by Special Master Marbury above mentioned.

Mr. Gallagher emphasizes the value and importance to the receivership of a particular legal contribution that he made. It relates to the accrual on the books of the Receivers of the obligation to pay interest on certain overdue instalments of interest on some of the mortgage bonds. The matter developed in this way. Prior to April 1943 one of the auditors of the Seaboard raised the question as to whether the Receivers were not obliged to accrue this interest. The matter was then referred by the Receivers to their counsel and Mr. Gallagher (in conjunction with Messrs. Cocke and Fleming) prepared an elaborate printed memorandum of 113 pages with the conclusion and advice that the Receivers were liable to accrue such interest with respect to some but not others of the 14 separate issues involved. This memorandum was filed with the court April 10, 1943. Various of the several mortgage trustees filed petitions asking the court to order the accrual of this interest. On April 16, 1943 (Receivership Record 22316) Judge Way, sitting jointly with Judge Akerman, heard the petitions and referred the matter to Mr. Tazewell Taylor as special master to report thereon. Mr. Taylor filed his extended report with a form of recommended decree on May 19, 1943 (Receivership Record 22742–22809). In this report the special master made recommendation for the accrual of interest on overdue interest payments of some of the bond issues. A separate report was made by the special master to Judge Akerman for the Florida Court (Receivership Record 22818–22899). His report in general confirmed the recommendations of counsel and subsequently Judge Way in turn confirmed the master's report on June 18, 1943 (Receivership Record 23036) and the auditing department of the Receivers in consequence applied the order in accruing interest. The result was that in subsequent income tax accounting, under the applicable rules thereof, this accrued interest on overdue instalments of interest under some of the bond issues became deductible in the determination of the federal tax liability, and it is said that over a period of years

the tax liability was diminished by about $13,000,000.

I have examined the extended memorandum prepared by counsel for the Receivers and understand that it was largely the work of Mr. Gallagher and his associates in his firm. The memorandum shows the result of very extended study and careful application of the law to the several mortgage bond issues. It appears therefrom that the general rule of law is that mortgagors are bound to pay interest on overdue and unpaid interest coupons at least until the maturity of the bond issue, and this general rule upon the subject apparently prevails under the judicial decisions in the six States, in which the Seaboard operates, except New York. But with respect to the applicability of the New York law, other questions had also to be considered including (a) whether the particular mortgage had been executed in New York or some other State; (b) whether the interest was payable in New York and (c) whether the mortgage contained express covenants for the payment of interest on overdue instalments. Still other questions involved for some of the mortgages were what was the conflict of laws rule in the respective six States, and the application of that rule to the provisions of the several mortgages. The advice of counsel was that since Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, the law of the forum (Virginia and Florida) with respect to conflict of laws must be applied. The memorandum represents a fine piece of legal work.

It seems to be suggested that Mr. Gallagher's compensation should be very liberal indeed in view of this particular contribution. While I recognize the excellence of the legal work, I do not think it should be given the emphasis attributed to it in this connection. Although important in itself, it was only one of many questions arising during the receivership referred to counsel for an opinion. The result in subsequent income tax accounting

was merely a legal consequence of the applicable law, and, as heretofore noted, Mr. Gallagher's firm has been paid by the Receivers very substantial fees for the particular income tax work.

In determining a reasonable further allowance to Mr. Gallagher too much emphasis must not be put merely upon the amount of the time charge, for the reasons I have indicated. The whole situation must be viewed in its broader aspects. Considering all the circumstances I think a further allowance of $80,000 to Mr. Gallagher will be reasonable.

■ There remains to be considered the Receivers' recommendation for some further allowance to their auditor and chief finance officer, Mr. R. T. Jones. They have suggested the very large sum of $100,000.

Mr. Jones has been associated with the Seaboard Railway for many years. He was first employed as a payroll clerk at a salary of $60.00 a month. His ability, industry and loyalty have been recognized by frequent advances and increases in salary. At the time of the receivership in 1930 his salary was $15,000 a year. During the receivership, and despite the poor financial results in the earlier years, his salary had again been substantially advanced from time to time, first to $18,000, then to $20,000 and on January 1, 1946, to $25,000 a year.

Mr. Jones' ordinary duties as auditor and finance officer were greatly increased as the result of the receivership, especially during the last few years on hearings of the reorganization plan, for which he has been called upon to furnish voluminous statistical data. It is said that he has had to prepare more than 600 separate exhibits for this purpose. I have seen quite a little of his activities in this connection during the last few years but the Receivers themselves are much more intimately familiar with his work and in making him some additional allowance I rely strongly upon their much more personal knowledge of the excellence and extent of his service. He has been unsparing of himself in his work and has largely foregone his usual vacation periods. I do not feel it reasonable to make anything like the large allowance

suggested. His ability and industry have been very substantially recognized by the increases in salary that he has received. Comparison may be made with the case of Mr. Cocke, General Counsel of the Railway, whose original basic salary of $25,000 a year was not increased during the receivership despite his reasonable hope and expectation that it would be, and despite the fact that his own duties have been greatly increased by receivership work. I think that an additional allowance of $10,-000 to Mr. Jones will be reasonable.

The successful reorganization of the Seaboard was consummated on July 31, 1946, by the transfer of the properties to the new Seaboard Air Line Railroad Company, after the Interstate Commerce Commission by its report of June 28, 1946, had approved the issuance of the new securities. The court is informed that the voting trustees provided for in the plan of reorganization have selected a Board of Directors and the latter have organized by the election of Mr. Powell as the first President of the new Railroad and Colonel Anderson as Chairman of the Board and that Mr. Cocke has been made Chief Counsel to the new Railroad and Mr. Gallagher has been retained as of counsel. The Receivers and their counsel, as officers of the court, are to be congratulated upon their successful management of the receivership and are entitled to the thanks of the court in the public interest for their untiring, efficient and valuable service. Their current compensation as counsel and receivers ceased upon the reorganization on July 31, 1946, but it is realized that the Receivers must still continue to function for the purpose of making a financial accounting in accordance with the forclosure decree and possibly other similar outstanding matters. This will necessarily entail some further delay before the Receivers can be finally discharged. For such services as both the Receivers and their counsel may be called upon to perform in the future application in due course can be made to the court for reasonable compensation therefor.

■ Railroad receiverships and reorganizations should be economically administered; but where they are necessary

in the interests of the security holders the courts must pay reasonable and just compensation to its officers who carry out the necessary administrative work. And these officers must be fairly compensated in view of the extent and success of their services; otherwise the courts would not be able to function at all in such matters because competent officers would not be available. The view has been publicly expressed that court receiverships and reorganization of railroads have in the past been unnecessarily expensive and economically wasteful. Assuming the criticism to be sound it is nevertheless a fact that under existing legislation an insolvent or financially embarrassed railroad cannot successfully continue to function in the public interest without the aid of the courts. The only alternative to court receivership was reorganization under section 77 or Chapter XV of the Bankruptcy Act, as added in 1939, 11 U.S.C.A. §§ 205, 1200 et seq. Chapter XV is not presently in force, and when it was extant it was available to only a limited class of railroads. Where it has been available it has proven itself much more efficient, speedy and economical than reorganization under section 77. In the particular Seaboard case much consideration was originally given by this court to the question whether the reorganization should be carried through under section 77 or continued in equity. See Guaranty Trust Co. v. Seaboard, D. C., 53 F.Supp. 672, 697, 4 Cir., 145 F.2d 40. It was the unanimous wish of the security holders that the reorganization should continue in equity. Since the enactment of section 77 it is probable that further railroad reorganizations in equity will be few, if any. See New England Coal & Coke Co. v. Rutland R. Co., 2 Cir. 143 F.2d 179. Until there is further legislation upon the subject the courts can only apply the established law. They would doubtless welcome relief from the present conditions under which they have the judicial obligation to function as best they can under existing legal procedure. It may be noted that the Railroad Reorganization Act passed by both Houses of Congress on July 31, 1946, was vetoed by the President for reasons stated by him.