GUARANTY TRUST CO. OF NEW YORK et al. v. SEABOARD AIR LINE RY. CO. et al. (two cases).

Nos. 213, 214, 228, 229, Civ. 172–174, 237, 238, 309.

Nos. 700, 705, 725, 726, 277-J Civ., 453-J Civ., 544-J Civ., 603-J Civ., 669-J Civ.–671-J Civ.

District Court, E. D. Virginia.

District Court, S. D. Florida.

Oct. 16, 1946.

W. R. C. Cocke, of Norfolk, Va., and Harold J. Gallagher, of New York City, for receivers.

Leonard D. Adkins, of New York City, and William H. Rogers, of Jacksonville, Fla., for Reorganization Committee.

F. P. Fleming, of Jacksonville, Fla., for receivers in Fifth Judicial District.

W. Meade Fletcher, Jr., of Washington, D. C., Chief Railroad Counsel for R. F. C.

William L. Marbury, of Baltimore, Md., special master.

Tazewell Taylor, of Norfolk, Va., in his own behalf as special master.

H. Vernon Eney, of Baltimore, Md., special counsel in behalf of receivership estate and creditors.

Carlyle Barton, of Baltimore, Md., for Maryland Trust Co.

Arthur B. Brenner, of New York City, for Refunding Mortgage Bondholders Committee.

Delano Andrews, of New York City, for Bondholders Protective Committee for First and Consolidated Mortgage.

Edwin S. S. Sunderland, of New York City, Leon A. Seawell, of Norfolk, Va., and H. P. Adair, of Jacksonville, Fla., for Guaranty Trust Co. of N. Y. and another.

Theodore S. Garnett, of Norfolk, Va., for Maryland Trust Co. under first mortgage.

Robert D. Ruffin, of Norfolk, Va., for Mercantile Trust Co. of Baltimore, Trustee under Raleigh & Gaston Mortgage.

Edward McCarthy, of Jacksonville, Fla., for First Mortgage Trustee, and for Florida West Shore Mortgage Trustee.

Elliott Adams, of Jacksonville, Fla., for Julian Hartridge, for Bethlehem Steel Co.

W. D. Jones, of Jacksonville Fla., for Refunding Mortgage, Florida Xentra. & Peninsular First Mortgage.

Abraham Mitnovetz, of New York City, and Harry O. Levin, of Baltimore, Md., for Protective Committee for Holders of Georgia & Alabama Ry., First Mortgage Consol. Bonds.

L. N. Rothschild, for Rothschild, Rippel & Westerlund.

Paul R. Kach, of Baltimore, Md., for Mercantile Trust Co., trustee.

Irwin L. Tappen, of New York City, for New York Trust Co. and Augustus C. Downing, trustees.

John P. Carson, of New York City, for E. N. Brown.

PER CURIAM.

The Seaboard Air Line Railway was placed in receivership in the Eastern District of Virginia on December 23, 1930, with ancillary receivership proceedings in the Southern District of Florida. From shortly thereafter, until his regrettable illness and death in October 1943, the receiv-

ership was under the judicial supervision of Judge Way in Virginia and has continuously from its inception been under the judicial supervision of Judge Akerman in the Southern District of Florida in the ancillary proceedings.

For the first ten years of the receivership the net income of the railroad was so small that it was impossible to formulate a plan of reorganization which had any hope of success, but in the latter part of 1939 Judge Way appointed Mr. Tazewell Taylor, who theretofore had been one of several counsel for the receivers, as a Special Master to take evidence and submit a plan of reorganization. Mr. Taylor resigned as counsel and his appointment as Special Master was confirmed by Judge Akerman.

After protracted hearings of all parties in interest Mr. Taylor filed his report with the proposed plan of reorganization on July 20, 1943. Hearings on exceptions to the plan were set for the latter part of October and Judge Chesnut of the Maryland District was specially assigned to further consideration of the matter in view of the illness of Judge Way. Joint hearings on the exceptions were held in October and November 1943 by Judges Akerman and Chesnut and with important modifications, occasioned largely by more recent developments, the plan of reorganization was confirmed. Guaranty Trust Co. v. Seaboard Air Line Railway, D. C., 53 F.Supp. 672. On the appeal of a very small minority of the bondholders the order of confirmation was affirmed by the Fourth Circuit Court of Appeals, Badenhausen v. Guaranty Trust Co., 145 F.2d 40. Certiorari was denied by the Supreme Court, 323 U.S. 797, 65 S.Ct. 440, 89 L.Ed. 636. A separate appeal was taken in the Fifth Circuit which resulted in affirmance, Badenhausen v. Glazebrook, 148 F.2d 450, certiorari denied, 326 U.S. 733, 66 S.Ct. 42.[1]

The last of the critical litigations affecting the plan having been successfully terminated in December 1945, application was made to the Interstate Commerce Commission to finally approve the issuance of securities by the new reorganized corporation. This approval was given in a report of the Commission on June 28, 1946; and the reorganization was consummated on July 31, 1946, by the transfer of the railroad properties to the new corporation, Seaboard Air Line Railroad Company.

The reorganization plan provided for the appointment of a reorganization committee by the courts. In accordance therewith Messrs. Otis A. Glazebrook, Jr., Joseph France and Charles Markell were appointed as the reorganization committee in December 1943. In January, 1945, Mr. Charles Markell was appointed a member of the Maryland Court of Appeals and resigned as a member of the committee and Mr. S. Ralph Warnken was appointed in his stead. The committee selected as its counsel Mr. Leonard D. Adkins of the New York law firm of Cravath, Swaine & Moore. This committee has diligently and successfully furthered a consummation of the reorganization over a period of more than two and one-half years.

The decree of foreclosure and the sale, as a necessary step in the consummation of the plan of reorganization, provided that there should be set aside from the funds in the hands of the receivers a sum of $10,000,000 from which should be paid, among other things, necessary expenses of the reorganization. And the plan itself provided, with respect to expenses that there should be paid, "The actual and reasonable expenses (including reasonable attorneys' fees) incurred in connection with the proceedings and Plan by parties in interest and by the Reorganization Committee and committees or other representa-

---

[1] For incidental and other litigation related to the receivership, and the reorganization plan, see Badenhausen v. Baetjer, 4 Cir., 146 F.2d 762, certiorari denied, 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432; Guaranty Trust Co. v. Seaboard Air Line Ry. Co., 60 F.Supp. 607; Godfrey v. Powell, 5 Cir., 150 F.2d 486, certiorari denied 326 U.S. 779, 66 S.Ct. 272; Godfrey v. Powell, 5 Cir., 155 F. F.2d 51; Guaranty Trust Co. v. Seaboard Air Line Ry. Co., D.C., 62 F.Supp. 207, affirmed Dure v. Glazebrook, 152 F. 2d 756, certiorari denied 66 S.Ct. 1346, Case 3; Blackford v. Powell, 4 Cir., 151 F.2d 392, certiorari denied 66 S.Ct. 523, Case 1.

tives of creditors and stockholders, and for the actual and reasonable expenses incurred in connection with the proceedings and Plan and reasonable compensation for services in connection therewith by Trustees under indentures, depositaries * * *."

In the latter part of 1945, in anticipation of the consummation of the reorganization the court ordered that certain claims for allowances for compensation and expenses should be filed by a certain date. In consequence thereof about sixty separate claims for compensation and expenses were filed. In February, 1946, both courts appointed Mr. William L. Marbury of the Baltimore Bar a Special Master to take testimony, consider and report on proper allowances to be made. Later, as the security holders interested in the reorganization had not actively participated in the matter of allowances to be made, (with the exception of counsel for the Reconstruction Finance Corporation acting for the Treasury of the United States with respect to its interest as a creditor in the amount of about $14,000,000, holding as pledgee a large amount of Seaboard bonds) the court appointed Mr. H. Vernon Eney of the Baltimore Bar to act as special counsel in the hearings before the Master on behalf of all security holders interested in the plan.

Special Master Marbury filed his report on or about August 1, 1946, which is a printed document of 198 pages with an exhibit in which the respective claims for compensation and for expenses of the several claimants are listed and the total amounts claimed stated together with amounts which had been previously paid on account respectively and further amounts recommended by the Special Master to be paid out of the fund in hand, or from available committee funds. The first 55 pages of the report gives an interesting history of the receivership from its inception, the substantial correctness of which has not been challenged. It also states the legal basis for and the principles to be applied in allowances to be made and then in detail considers, discusses and makes recommendations as to amounts with respect to the several claims. The summarized conclusion of the Master on the last two pages of the printed report is as follows:

"A table has been prepared and is attached hereto marked Appendix A which shows the allowances of compensation made to the indenture trustees and the bondholders' committees and their respective counsel as well as to counsel for the petitioning creditor. From this it appears that the total sums previously paid as compensation to these claimants out of the receivership estate aggregate $389,017.79. The total additional allowances requested by the petitions by way of compensation aggregate $2,420,598.71. The total additional allowances herein recommended to be paid are $827,242.50, which added to the allowances previously made, aggregate $1,218,260.25. In addition, payments which, pursuant to the provisions of Section 77 (p) of the Bankruptcy Act are approved as reasonable to be paid by bondholders' committees out of funds withheld from depositors under the terms of the deposit agreements, aggregate $412,250.00. The table does not include the expenses, other than counsel fees, of the indenture trustees or of the committees. The amount of these expenses previously reimbursed to petitioners by the receivers and now recommended to be charged against the fund set aside under the foreclosure decree aggregates $347,681.87. The additional amounts for which allowances are asked in these petitions total $192,088.92 which will be substantially reduced on the audit made by the receivers in accordance with the recommendations previously made.

"These sums seem large, but it must be borne in mind that they represent the work of hundreds of highly skilled experts over a long period of years. It is confidently asserted that the allowances herein recommended will enrich none of the participants in these proceedings and will afford them no more than very moderate compensation for their services."

A period of twenty days was allowed for filing of exceptions to the report. Of the sixty claims considered by the Master exceptions were filed as to twenty-eight. Two of these were subsequently voluntarily dismissed after hearing.

A hearing on the exceptions to the Master's report was held jointly by Judges Akerman and Chesnut on September 16 to 18, 1946. Oral arguments were submitted by the majority of the exceptants. A few submitted their contentions on brief or memorandum. All the oral arguments and briefs have been carefully considered by the court. The purpose of this opinion is to announce our conclusions with respect to the several exceptions.

The number of claims for compensation in this case seems unusually large even for a railroad reorganization. This is due to the highly complex financial and legal structure of the Seaboard. The system embraces more than 4,000 miles of railroad operated in six States (Virginia, North Carolina, South Carolina, Georgia, Alabama and Florida) in two Federal Judicial Circuits, the Fourth and the Fifth. There were ten underlying bond issues constituting a first lien on part of the system, and four general mortgages constituting' in part first liens and in part second and third liens. There were, of course, separate Trustees under Deeds of Trust for the several mortgages; and when the railroad went into receivership numerous committees were formed in the interest of the holders of different bond issues. With respect to some of the issues there were committees for both majority and minority groups of bondholders. There were also various bank or trust company depositaries for various bond issues. As we have seen the plan of reorganization provided for reasonable compensation and expenses of the depositaries, trustees and their counsel; and also for reimbursement of the reasonable expenses of the committees but not for compensation of the latter.

█ After careful consideration of the oral arguments and briefs of the exceptants to the allowances recommended by the Master's report, we find little to modify or change in his recommendations. There is no controverted issue of law to be decided. The only questions presented are whether the monetary amounts of allowances are reasonable and fair within the principles controlling the exercise of discretion in cases of this nature. These principles have been correctly stated by the Master in his report (pages 64 to 66). The gist thereof is that the allowances must be just and reasonable, but moderate rather than generous. The case is not one in which the court is dealing with a large fund created directly or primarily by the efforts of claimants. While the fund in hand reserved for the payment of the expenses of the reorganization is in this case ample, it has resulted neither directly nor primarily from the activities of the claimants, but rather from the unexpected large increase in railroad revenues as the result of the recent War. The $10,000,000 fund reserved in the foreclosure decree for the payment of all expenses of reorganization also contemplated the possibility of very large payments which might have to be made therefrom in the event of unsuccessful litigation affecting the reorganization and amounts that might have to be applied in cash payments to non-assenting bondholders. Fortunately all the litigation has resulted favorably and the percentage of assenting bondholders is in the very high amount of more than ninety-six percent. The unexpended balance of the fund will go to the new reorganized corporation and thus inure to the benefit of the new security holders and afford greater security for the continued successful operation of the reorganized railroad in the future, which, under present conditions, contains many elements of much uncertainty with respect to the financial future of railroads generally.

We find it unnecessary to review and comment in detail on all the several exceptions as the facts applicable to each of the claims for compensation have been severally stated and considered in the Master's report. Our point of approach to the problem of the exceptions is governed by Rule 53(e) (2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous * * * the court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

No further evidence was received at the recent hearings and we find no clear error

in the Master's recommendations except in the relatively few instances hereinafter noted. With respect to each claim the Master has found and stated the substance of the relevant evidence before him. No serious complaint is made as to these respective findings of fact. What is assailed by the exceptions is the amount of the allowances recommended on the basis of the facts recited. It may be questioned whether the amounts so recommended in the several cases are to be treated themselves as findings of fact or as questions of law. But as already indicated we find the amounts so recommended reasonable under all the circumstances of the case with a few exceptions.

The total amount of the claims for compensation submitted to the Master is nearly $3,000,000. And this is exclusive of the necessarily heavy expenses of current administration in compensation to the receivers and their counsel which have accrued during the more than fifteen years of receivership, and the compensation which must be paid to the reorganization managers and their counsel which is an administration expense of the same general nature. And in the same category falls compensation paid and to be paid to Special Master Taylor for his four years work in consideration and preparation of the plan of reorganization and as Special Master for the sale; and further just allowances to be made to Special Master Marbury for his present report and to special attorney Eney.

The reasonableness of the several recommendations made by the Master's report must be determined in view of the whole case as outlined in the Master's report and other facts and proceedings in the case of which the courts will take judicial notice from familiarity with the case. Many of the exceptants have stressed the fact that the period of their services has run over a long time and it is pointed out that the whole receivership has had the unusual duration of fifteen years. It is, however, not correct to say that any of the exceptants have rendered continuous and uninterrupted service over this period. Some of the services have been only for a relatively short period of time and

even in the case of the Trustees under the several mortgages and their counsel and counsel for various committees of bondholders, the services have not been continuous throughout the period but have varied greatly both in intensity and extent. In many cases there were months when work was more or less intense and continuous followed by lulls of years of comparative inactivity. Thus at the inception of the receivership there was a comparatively intense period for a certain time. Again a few years later there was another crisis which required intensive work. Again during several years, 1940 to 1943, while Special Master Taylor was taking testimony and considering various plans of reorganization the work of some of the committees and their counsel was protracted and arduous. And again when the plan of reorganization submitted by Special Master Taylor was up for consideration by the courts in extended hearings, there was renewed activity of counsel.

The sum of nearly $3,000,000 requested as compensation, exclusive of reasonable expenses allowed or to be allowed seemed at once to the Special Master, and also seems to the courts, excessive. The recommendations of the Master have reduced the total amounts heretofore paid and now to be paid from the receivership funds to $1-218,260.25 (with some little adjustment due to errors in computation hereinafter mentioned). And in addition thereto the Master has recommended that additional compensation should be allowed to committees, parties in interest and their counsel in the amount of $412,250 to be paid if available from assessments on bonds deposited under the respective depositary agreements under which the several committees were constituted. The aggregate of these allowances (more than a $1,500,-000) is certainly very substantial and, in our opinion in the aggregate reasonable within the required legal and equitable principle that the allowances must be moderate rather than generous. It must not be forgotten that the court is dealing with the reorganization of a heavily insolvent railroad corporation, in which stockholders having original investments of many millions of dollars have entirely lost their in-

vestments and unsecured creditors received nothing and even bondholders under the Adjustment Mortgage have also received nothing as their mortgage was subordinate to the refunding mortgage which itself is not paid out in full, and even some of the secured bondholders have likewise suffered substantial losses either of principal or of interest or both. And we think it no sufficient answer in this whole situation, that, as pointed out by some of the exceptants, there has been a large increase in the market value of most of the securities during recent years—especially in view of the uncertainty as to the financial future of the railroads.

Some of the exceptants criticise the Master's report on the ground that, in the recommendation for allowances to be made, there has been unfair discrimination to the prejudice of some of the claims. We have carefully considered the alleged grounds on which this criticism has been made, but find them substantially unsupported. A study of the Master's report seems to us to show that in making the several recommendations the Master has kept fairly in mind the overall situation and made his recommendations with respect to each claim in fair proportion to the work as a whole and in consideration of the nature, extent and value of the services of the respective claimants.

With respect to many of the exceptions we make the comment that if their respective claims were to be individually considered as ones isolated from the entire situation the arguments advanced in support thereof seem plausible and reasonable. But these respective contentions must be checked by consideration of the overall situation. The nature of the claims as a whole and in relation one to another shows that there has been (perhaps naturally enough in view of the complicated legal and financial situation) a very great *duplication* of effort in many cases by the respective claimants. For instance, counsel for trustees and counsel for committees of bonds (both majority and minority groups) were in many instances working to the same end. Naturally and properly enough the respective counsel felt responsibility to

their respective clients but as their interests were largely the same they did go over much the same ground. Again as the receivership existed in two separate Circuits the principal counsel for many of the parties in interest procured the services of local counsel at Norfolk in the Fourth Circuit and at Jacksonville in the Fifth Circuit. It is obvious that there was much duplication of professional effort in such cases; and as the record shows the nature and extent of the services of the principal counsel, located in New York or Baltimore and that of the local counsel in Norfolk and Jacksonville also varied greatly one from another. It is very evident from the Master's report dealing with the separate cases that he fairly kept these considerations in mind. We think it must be evident that in such a situation the aggregate fee to be paid to several counsel for the particular service should not be greatly in excess of what would be reasonable compensation if there had been only one counsel engaged.

Another consideration that runs throughout the whole case is that during the first ten years of the receivership (1931–1940) the net income of the railroad was very small and the market value of the bonds was likewise very small. Counsel were, therefore, during this period engaged in professional work where it would have been quite impossible on any equitable basis to have paid anything like the amounts now recommended by the Special Master. It is only by reason of the much larger revenues in the War period that there is now a reasonable possibility of paying the substantial fees recommended.

We come now to a more particular discussion of some of the exceptions. In the first place it is to be noted that there are no exceptions to allowances by the security holders other than the comment submitted by the counsel for the Reconstruction Finance Corporation to the effect that it would oppose allowances in greater amounts than recommended by the Master. Special attorney Ency has, however, filed exceptions to some few of the recommended allowances based on some errors in computation as contained in Exhibit A filed with the Master's report. In the hear-

ing the errors so pointed out, relatively small in number and aggregate amount, were agreed to by the respective claimants and will be corrected in the order hereafter to be filed.

### Allowances to Guaranty Trust Company and the Consolidated Committee

With respect to the amounts involved the most important exceptions revolve around the Guaranty Trust Company as Trustee and depositary of the Consolidated 6% General Mortgage Bonds and to compensation of counsel for Trustee and the committee respectively.

The Guaranty Trust Company was the corporate Trustee for the Consolidated 6% Bonds of which more than $60,000,000 par value were publicly held. Early in the receivership or even shortly before it, a committee of strong personnel was formed to act in the interest of the bondholders. This committee selected the trustee, the Guaranty Trust Company, as depositary for the bonds. At one time it had bonds on deposit in the amount of about $25,000,000 par value. Many of these were withdrawn during the receivership leaving a balance of about $12,500,000 with the depositary. Counsel for the trustee was the well-known New York law firm of Davis, Polk, Wardwell, Sunderland and Kiendl. Counsel for the committee was Sullivan and Cromwell, another well-known New York law firm. The first chairman of the committee was Colonel Murphy, an investment banker and prominent figure in the New York financial world. Upon his death in 1938 he was succeeded as chairman by Mr. Otis A. Glazebrook, also an investment banker and member of the firm of Hornblower and Weeks, and subsequently one of the reorganization managers of the Seaboard. The collateral securities held by the Trustee were large in amount and complicated in nature. Counsel for the Trustee and especially Mr. Sunderland have taken an active part in the receivership and reorganization proceedings from time to time. Mr. Sunderland was particularly helpful and cooperative with respect to the modifications of the reorganization plan made by the court in the 1943 hearings. Counsel

for the committee have also taken an active and helpful part throughout the whole matter.

The Guaranty Trust Company as Trustee has asked for total compensation (including $56,000 heretofore received) in the amount of $93,500, of which the Master has allowed $68,500. Counsel for the Trustee has asked for total allowances (including the $50,000 heretofore paid) in the amount of $350,000. The Master has allowed in the aggregate $165,000. Counsel for the committee has asked for a total allowance of $300,000 of which the Master has allowed $100,000 to be paid from the receivership fund and $50,000 by the committee. As a depositary the Guaranty Trust Company has also asked for compensation (excluding expenses) in the amount of $95,-255.80 of which amount the Master has allowed $55,436.68.

Counsel for the respective parties has earnestly argued that these allowances are wholly inadequate for the services performed. We have carefully considered the arguments submitted and the discussion of the respective amounts in the Special Master's report. For the reasons therein and hereinabove stated we are not persuaded that the judgment of the Master as to the reasonableness of the amounts allowed by him is erroneous. Nor do we find that the allowances so made are disproportioned to other somewhat similar allowances considered and made by the Master in view of the respective interests and services.

It is also to be noted from the tabulation filed with the Master's report under Section 4 that, of the total amount to be paid as compensation to the counsel to various committees $415,250 is to be paid from general receivership funds and the remainder, $272,250 is to be paid from funds available to the respective committees from assessments on the bonds. It would seem equitable that the latter funds should naturally be the primary source for the payment of fees to the counsel of respective committees; especially as during the receivership and up to the confirmation of the plan of reorganization the respective committees were striving for preferred or more favorable positions in the reorganization for

their respective bondholders, and in this respect their positions were necessarily more or less antagonistic. This matter has been discussed in the Master's report. While we agree with his conclusion, under all the conditions, that substantial charges may properly be made for this purpose against the general receivership funds, it is our view that the Master has been liberal rather than otherwise in the amounts charged against the receivership funds.

 It is particularly argued that the services of the depositary were largely clerical in nature and that so large a reduction from the figure asked is unreasonable. In support of this contention reference is made to the schedule for depositary charges recommended by the American Bankers Association, and it is said that the Master by an erroneous calculation has said that the amount asked for somewhat exceeds the schedule while by the correct calculation the amount is very slightly less than the scheduled rates. However this may be, the reasonable charge to be paid from receivership funds is not necessarily determined by any fixed schedule. Such a schedule is doubtless formulated for the average case not involving very large amounts of deposited bonds. It seems only reasonable that where the volume of clerical transactions is very great, as in this case, the rate per unit should be smaller. The rates per unit set up by the Master in his report (page 146) seem to us to be reasonable or at least not clearly erroneous for the particular situation. We must, therefore, overrule all these exceptions.

But a different and more difficult question is presented by the exception to the amount of $90,000 recommended by the Special Master to be allowed the members of the Consolidated committee, to be paid from committee funds. In addition to the successive chairman of this committee there were seven other members, most of them very prominently identified with financial interests in New York City. As has been stated by the Master they constituted a very able and aggressive committee and their respective chairmen have given able and extensive services at many periods of the receivership to financial matters of great importance arising from time

to time and in the reorganization proceedings. The Special Master has very fully discussed the personnel and activities of the committee (pages 141–144 of his report). He concluded that an allowance of $50,000 to the chairmen of the committee and $10,000 each to four of the seven members in addition was sufficient. He made no allowance to three other members of the committee who he found should be denied compensation because they had directly or indirectly dealt in Seaboard securities. The correctness of this latter conclusion has not been challenged.

It has been earnestly argued to us that the allowance of only $50,000 to the two successive chairmen of the committee is wholly inadequate. We have carefully read and considered the discussion of the matter in the Special Master's report and we have also read and considered particularly the evidence upon the subject given before the Special Master by Mr. Glazebrook supplemented by his personal statement at the recent hearing. We find these statements of the activities and importance and effectiveness of the committee's work in this case in the interest of the bondholders impressive and we have concluded that there should be some increase in the amount of compensation recommended by the Special Master.

Before stating the additional amount that should be allowed attention should be called to the particular situation affecting the compensation of members of the committees in this case. It will have been noted on closely reading the provision in the plan of reorganization above quoted that the plan did not provide for the payment from receivership funds of compensation to committees although it did provide for payment therefrom of their reasonable expenses.

The agreements constituting the several committees, (including this particular committee) under which the bonds were deposited provide for payments by or assessments upon the bondholders for committee expenses. It appears that after payment of all other committee expenses including the $90,000 recommended to be allowed by the Special Master, the committee will still have in hand or hereafter made available about $75,000. There will, there-

fore, be available to the committee further funds from which a larger amount than that recommended by the Special Master can be paid to the committee members for their services.

It was earnestly argued before the Master that despite the fact that the reorganization plan did not provide for compensation to committee members there was a broader provision in the foreclosure decree which would authorize such payments from receivership funds, but after careful consideration the Master concluded to the contrary (see printed pages 55 to 64 of report). We concur in this view. However, the Master also determined that Section 77, sub. p of the Bankruptcy Act, as amended, 11 U.S.C.A. § 205, sub. p, authorizes this equity court to examine depositary agreements constituting creditors' committees and to enforce accounting thereunder and to restrain the collection of unreasonable amounts for compensation and expenses. In view of the Master's conclusion that the committees could not properly be paid from receivership funds several committees in this case then invoked the application of Section 77, sub. p by the Master to determine the reasonable maximum allowances to be made to committee members from available committee funds and in consequence thereof the Master by his recommendations has established maximum allowances that may be made to the several committees from their respective available funds. The wording and applicability of Section 77, sub. p to this case is not entirely clear and free from doubt, but no question of law has been raised with regard thereto by the exceptions and the arguments which were submitted at the recent hearing. We, therefore, find it unnecessary to further consider the Master's conclusions of law in this respect which, as we understand it, are not disputed by the exceptants.

With regard to the maximum amount to be applied by the members of the Consolidated committee, for their own compensation from their available funds, as already indicated, we think the amount recommended by the Master is too low. We are impressed by the value to the bondholders of the very active and efficient services of

this committee especially by its chairmen. Colonel Murphy and Mr. Glazebrook successively have rendered very important and influential service during the receivership and reorganization. During the receivership many financial matters of great importance to Seaboard arose and received their careful attention and as to which they gave advice to the receivers and to Judge Way. It seems evident to us that their financial contacts and experience and active personal efforts were an important factor in the successful management of the receivership and subsequent reorganization. It has not been possible for Mr. Glazebrook to submit statistical data as to the amount of time that Colonel Murphy and he successively gave to Seaboard matters, but it is clear that it was very considerable involving frequent appearances in court or trips from New York to other cities to confer on important Seaboard matters. It is even more difficult for courts to definitely determine reasonable compensation for financial advice and assistance than to appraise the value of legal services, but after careful consideration we take the view that the value to the Consolidated bondholders of the financial service of the committee members in this case at least approximates the monetary value of services of the committee's counsel who have been or are to be allowed $150,000.

It is clear that the combined efforts of the financial men (committee members), and lawyers to the Consolidated bondholders have contributed greatly to the amounts which they have realized through the reorganization. In the early days of the receivership the market value of the bonds was at the nadir, being only about two percent of their par value. Just prior to the reorganization the bonds had a market value in the 70's. There was thus an increase in the market value of over $40,-000,000. Of course the increased net revenues of the railroad during the War period and changed economic conditions generally, were far the most potent factor in this great increase, but if it had not been for wise management during the receivership and the great physical improvement of the railroad system it would not have been in

a position to earn these much greater revenues. The responsibility and credit for this good management properly goes very largely to the receivers but we are impressed by the evidence that throughout the financial advice of the committee members was of very considerable value and helped the receivers in formulating and exercising their management policies.

We must also bear in mind in this connection that the compensation to be paid to the committee members comes from funds provided by the bondholders and not from the receivership funds. Elsewhere we have indicated that the ample receivership fund available for expenses should not be drawn upon for larger than reasonably moderate fees to compensate counsel acting for partial interests only rather than for the estate as an entity. But that consideration is not applicable here where the committee members were acting primarily for the benefit of a particular bond issue and where their services have been a substantial factor in creating a very great benefit.

We conclude that the maximum amount that should have been recommended by the Special Master to be paid to the members of the Consolidated committee from the available committee funds should be increased from $90,000 to $125,000, to be divided among the several members of the committee (excluding the three held disqualified by the Special Master's report) as the committee members may agree upon.

### Certain Other Exceptions

Messrs. Howell, McCarthy, Lane and Howell have filed exceptions to the allowances made to them by the Special Master. Prior to his regrettable death in 1941, the head of this firm was Mr. E. Jaquelin L'Engle, a very well-known leader of the Florida Bar. From 1931 this firm was local counsel in Florida for the Maryland Trust Company as Trustee. In 1938 they were allowed by Judge Way, on the recommendation and report of Special Master Heath, $7,500. As local counsel to date they have asked for a total of $25,000. Special Master Marbury has allowed them an additional $5,000 which, after reading the testimony of Mr. McCarthy, we consider fair and proper for the reasons stated by the Master (Pages 123 to 125 of his report).

In addition this firm has requested an allowance of $15,000 for special and particular services in the preparation of complaint, taking evidence in Jacksonville and elsewhere and conducting foreclosure proceedings of the Florida West Shore Mortgage, resulting in a foreclosure decree in the amount of about $1,300,000 including accumulated interest and involving securities then having a market value of upwards of $1,000,000. For this particular service the Special Master has recommended a fee of $3,500. After careful consideration of Mr. McCarthy's testimony before the Special Master and his argument on the exceptions we have concluded that this allowance is too low. The Atlantic National Bank of Jacksonville became the substituted Trustee for this Mortgage. As Trustee it insisted upon the selection of this firm as its counsel to conduct the foreclosure proceedings. The firm had the responsibility of examining the Seaboard receivership proceedings which, as we know, have been extensive, and preparing the complaint and conducting the proceedings.

The foreclosure proceedings were recently conducted after the reorganization plan had been confirmed and were only a necessary step in the reorganization and there was no contest in the proceedings. Nevertheless the matter appears to have been one of a rather special and isolated nature involving care and responsibility on the part of this firm, without substantial assistance from other counsel, and involving no duplication of work. Mr. McCarthy states that the work was wholly his own and estimates that it required by itself about 300 hours of his time. We conclude that a reasonable, fair and moderate allowance for this particular service will be $6,500.

Messrs. Blount and Jones, leading lawyers of Jacksonville, Florida, were counsel for the Trustee under the Refunding mortgage. They asked for a total allowance of $25,000 for the whole period

of service during the receivership. They had previously been allowed and paid $7,500. The Special Master has made an additional allowance of $5,000. We have considered the testimony on their behalf before the Special Master and what he has said upon the subject. In addition thereto Judge Akerman has special familiarity with the professional services rendered by this firm during the ancillary receivership which he has continuously supervised. It is his opinion that the additional allowance of $5,000 made by the Special Master should be increased to $10,000 and it will be so ordered.

■ Mr. Julian Hartridge excepts to the allowance of $3,500 made by the Special Master as not reasonably adequate for his services rendered as counsel for the Bethlehem Steel Company in the ancillary proceedings. In this service Mr. Hartridge succeeded Mr. W. B. Crawford upon the latter's death in 1932. Mr. Crawford's estate was allowed and paid $5,000 by order of Court and it is the opinion of Judge Akerman by reason of his familiarity with the services of Mr. Hartridge that the allowance now to be made to him should be $5,000 instead of $3,500 and it will be so ordered.

■ Consideration has been given to the exceptions of the Irving Trust Company of New York as Trustee of the Atlanta-Birmingham First Mortgage and of its counsel, Messrs. Davies, Auerbach, Cornell and Hardy. Heretofore on the report of Mr. Taylor as Special Master, for services through December 31, 1943, the Trustee, by order of the Florida Court confirmed by the Virginia Court, has been allowed and paid the sum of $15,000 and their counsel $40,000. For subsequent services to date the Trustee now asks $1,000 additional and counsel $6,500 additional. The Master has allowed nothing further to the Trustee and $500 to counsel. After considering the exceptions and brief of counsel we conclude that the Trustee should be allowed a further sum of $500 and counsel $1,500 instead of $500.

The exceptions of White and Case and their allied counsel for services to the Bankers Trust Company as Trustee under the G. F. & A. Mortgage, will be postponed for further consideration in accordance with the recommendation of the Special Master as the result of his discussion on Pages 113 to 115 of the printed report.

With the modifications to be made as above enumerated we will confirm the recommendations for allowances made in Special Master Marbury's report and we request Mr. Eney to promptly prepare the appropriate order. With the exceptions above stated, we will overrule the objections filed to the Master's report in both courts.

## Compensation Allowances to Reorganization Committee and Its Counsel

On September 10, 1946, the reorganization committee filed its petition for compensation of its members and fees to be paid to its counsel. The committee asks for $115,000 for its members, and $180,000 for Leonard D. Adkins, their principal counsel, $12,000 for William H. Rogers, their local counsel at Jacksonville, and $1,500 for Henry K. Lankford, their local counsel at Norfolk. Their typewritten petition of 26 pages contains a succinct summary of the work, activities and accomplishments of the committee and of its counsel. This work has been closely observed from time to time as it has progressed by the Judges of the courts. In condensed form it correctly recites the activities of the committee and its counsel. In greater detail the services have also been orally stated in the testimony of three of the committee members and of Messrs. Adkins and Rogers.

The committee was appointed promptly after the original confirmation of the plan of reorganization in December, 1943; and, pursuant to the plan, Mr. Glazebrook, a New York financial and industrial executive, was appointed on the nomination of the Consolidated bondholders' committee; Mr. France, a Baltimore lawyer, long familiar with the Seaboard receivership, on the nomination of the Underlying bondholders' committee; and Mr. Markell was appointed by the courts as an independent member previously not associated with the Seaboard, and on his resignation Mr. Warnken was appointed in his place at the

request of the parties in interest attending the hearing for that purpose. The committee selected as their counsel Mr. Adkins of the well-known New York law firm of Cravath, Swaine & Moore, because he had at some previous time become acquainted with Seaboard affairs and was an outstanding lawyer expert in railroad reorganizations. He and the committee selected Messrs. Rogers and Lankford as local counsel.

The chief purpose of the committee was to carry through the plan of reorganization. To this end their services have covered a period of nearly three years, including some further period of time after the consummation of the plan on July 31, 1946, expected to be occasioned by minor and incidental subsequent matters. When appointed it was hoped that the reorganization might be concluded in a year or so, but it has been unavoidably delayed by pending litigation and the necessity of obtaining final approval from the Interstate Commerce Commission. Their petition for compensation clearly recites the principal activities of the committee. It was necessary for their counsel to participate importantly in at least five separate litigations in the two Circuits, including applications to the Supreme Court of the United States for certiorari in each case, all of which were ultimately denied. Another major activity of the committee was obtaining deposits of bonds and in this they have been successful to an unusual extent as compared with other railroad reorganizations. More than ninety-six percent of the bonds have been deposited. They also had to participate actively in proceedings before the Interstate Commerce Commission and a Congressional Committee, considering a proposed railroad reorganization bill which might have affected the reorganization of the Seaboard. In addition to the litigation it was necessary for the principal counsel to the Committee, Mr. Adkins, to prepare and file and appear in court with respect to many petitions of current great practical importance to the reorganization committee; and of equal importance was the preparation of the very elaborate, complex and detailed decree for foreclosure and sale and the preparation of the new first

and general mortgage, deeds for the transfer of the property to the new company, the voting trust agreement and other documents. When it is recalled that the railroad operates four thousand miles of railroad, that some of it consisted of leased lines, that the railroad operated in six different States and had very numerous subsidiaries, it must be obvious that there was a tremendous amount of professional work required with the added responsibility of professional certification to the new company, to security exchanges and others, of the validity of the instruments securing the issuance of new securities at par value of about $200,000,000.

In his testimony at the hearings Mr. Adkins submitted an exhibit which in tabulation shows the nature and extent of his professional services. It included the preparation and filing of twenty-eight separate petitions with court hearings on each. It shows also the holding of such hearings by the Virginia Court on about fifty separate days. From his testimony it also appears that he and other members or associates of his law firm have spent over eight thousand hours of professional time in furtherance of the activities of the reorganization committee and that he has personally given approximately one-half of his working time for nearly three years.

Mr. Glazebrook thinks that he has spent on an average one-fourth of his time during the past three years on this committee work, but this is only an estimate not based on any statistical record. In view of his many other important financial and executive activities this seems an over estimate. Mr. France has submitted time records to show that he has spent about one-third of his time in the service of the committee for three years and Mr. Warnken has likewise submitted records showing that he and Mr. Markell jointly had given about one hundred and thirty days or more of attention to the committee work including at least seven trips out of town to New York or elsewhere. We are not disposed to attribute controlling importance to this mere time record of the committee and its counsel. It is an indication, however, of the nature and extent of the professional work required. While Messrs. France,

Markell and Warnken each gave much professional attention to the legal papers involved in the reorganization, we are disposed to look upon the work of the committee members rather as supervisors and policy makers than from the standpoint of purely professional activity. The responsibility for this work and the leadership therein was imposed on Mr. Adkins and his local counsel. It is also to be borne in mind that here, as well as in the cases of other larger claims for compensation, gross fees received by lawyers are subject to general overhead expense of maintenance of their offices which frequently averages around thirty percent of the gross.

In determining fair compensation for the committee and its counsel it also must be borne in mind that they were very necessary agents in the effectuation of the plan for the benefit of all the security holders and not acting for any of the individual groups as has been the case very largely with the claims dealt with in the Master's report. The work of this committee and its counsel was, therefore, more analogous to that of the receivers and their counsel as an administration expense. They did not represent special interests, but rather the estate as a whole.

We have given some consideration to what amounts would in our opinion be reasonable compensation to the committee and its counsel, in addition to expenses which it has incurred. But we find it appropriate to defer our conclusions upon the matter until the determination by the Interstate Commerce Commission of the maximum limits approved by it for compensation and expenses of this committee.

When the reorganization committee was constituted it became necessary for it to apply to the Interstate Commerce Commission for permission and authority to solicit deposits of securities to carry through the proposed reorganization. This application was made in accordance with Section 77, sub. p of the Bankruptcy Act, Title 11, Section 205, sub. p, U.S.C.A. This permission was given by the Commission by its order dated April 14, 1944, in Finance Docket No. 14455, but there was imposed a condition reading as follows: "(2) That the compensation and expenses, including counsel fees and expenses, of the reorganization committee, shall be as allowed by the Court within maximum limits to be fixed by this Commission."

The reorganization committee should now promptly request the Commission to determine the maximum limits for compensation and expenses and report the same to the Courts for their further information and action.

### Allowances to Special Master Tazewell Taylor

As previously stated Mr. Taylor was appointed by Judge Way in the latter part of 1939 as Special Master to hold hearings of interested parties to consider a plan of reorganization and to submit a report thereon to the Court. Upon the original appointment of receivers by Judge Groner in December, 1930, Mr. Taylor was appointed one of four counsel to the receivers and as such acted and received compensation at the rate of $12,000 a year until he resigned upon his appointment as Special Master. His report was filed on July 20, 1943. In the meantime he had considered and made extended reports to Judge Way on various highly important detailed and incidental matters. His services in preparing his report required very careful study and consideration of the applicable cases of railroad reorganization and information with regard thereto from many Interstate Commerce Commission reports. He thoroughly acquainted himself with the whole subject matter. He held many extended hearings after notice to all parties in interest. These hearings were held in various places other than Norfolk. His work was so continuous and absorbing during a four year period that it very seriously interfered with and impaired his personal practice. He estimates his loss from income from that latter source as at least $80,000. His voluminous printed report in this case consisting of 283 large pages with numerous schedules of allocation of new securities was the foundation for the plan of reorganization which with modifications made by the court thereafter has now been successfully consummated. His elaborate report speaks for itself as to the nature,

character, complexity and thoroughness of the work done.

On February 9, 1946, Mr. Taylor filed his petition for additional compensation in this case as Special Master with regard to the report and as Special Master in some incidental and related matters including most importantly his duties as Special Master to sell the properties of the railroad. In his petition the extent of his services as Special Master for various purposes has been summarized. It is supplemented in more detail and emphasis by his personal evidence given at the recent hearing. His petition does not state the amount of his requested additional compensation, but in it and his testimony it appears he received from time to time compensation on account by orders passed by Judge Way in the aggregate amount of $57,500. In his oral testimony he suggests that an additional fee of equal amount be allowed him as additional compensation for his services in the matter or the reorganization report and that in view of the complexity, importance and responsibility of his duties as Special Master to make sale of the property a further sum of $25,000 to $30,000 would be reasonable. The sale price was $52,000,500, subject to liens of about $18,000,000.

Our conclusion is that Mr. Taylor should be allowed a further lump sum payment in the aggregate amount of $75,000 for all his services as Special Master in all matters and to this should be added the sum of $265.71 for expenses heretofore incurred and not reimbursed consisting principally of travel, postage and telephone.

Mr. Taylor is requested to prepare and submit promptly the appropriate order.

### Allowances to Special Master Marbury and Special Attorney Eney

Messrs. Marbury and Eney have also respectively filed affidavits and submitted evidence with respect to allowances to be made for their services. Mr. Marbury's affidavit shows that during March, 1946, he studied the history of the Seaboard receivership and familiarized himself with the important litigation affecting the reorganization and studied with care many reported judicial opinions relating to the general subject of allowances for compensation in equity receiverships and bankruptcy proceedings. He then read the numerous petitions for compensation in this case. From April 1 to June 4 he took 3,507 pages of testimony and read approximately 2,500 pages of detailed affidavits filed by the various claimants. Testimony was taken in Baltimore on seven days, in New York on seven days, in Norfolk on two days and in Jacksonville on two days. After studying the testimony he spent the whole month of July in preparation of his report. In all, the time occupied by him in the matter aggregated over 600 hours. His affidavit was supplemented by his oral testimony. His voluminous report of 198 printed pages with annexed table of allowances speaks for itself and is very clear evidence of the thoroughness of his work. The court has also had the benefit of expression of views from several parties attending the hearing as to what would constitute a reasonable allowance to Mr. Marbury for his services. His detailed itemization of expenses will be otherwise paid by the receivers. Our conclusion is that a fee of $12,500 is reasonable.

Mr. Eney was appointed as special attorney to represent the receivership estate and the creditors as a whole with respect to the petitions for allowances to be considered by Special Master Marbury. Promptly thereafter he familiarized himself with the Seaboard receivership and the progress of the reorganization with its related litigation and prepared himself for cross-examination of the witnesses before Special Master Marbury by studying the petitions and affidavits of the claimants, and conferring generally with regard to the whole subject matter with the chief railroad counsel of the Reconstruction Finance Corporation, and read a number of opinions of the Interstate Commerce Commission on the subject of fees and allowances in railroad reorganizations. He participated actively in the hearings before the Special Master and cross-examined the witnesses. He also participated in the argument before the Special Master with regard to certain legal questions which had arisen. He reread all of the testimony.

which had been given, aided the Special Master in preparation of certain statistical data, and prepared and filed certain exceptions on behalf of the receivership estate with respect to some errors in computation. He also reviewed the eighteen exceptions involving twenty-eight recommendations made by the Special Master in his report and appeared at the recent three day hearing and submitted arguments in support of various of the Master's recommendations and in answer to argument of various claimants. And to some extent he also participated in the hearing on other allowances by cross-examination of witnesses appearing in support of allowance to be made to the reorganization committee and its counsel and to Special Master Taylor. He has spent about 400 hours on this work exclusive of time spent in travelling. He has also incurred expenses not yet reimbursed for in the amount of $10.14. We consider that a very reasonable allowance for this service to the receivership estate is a fee of $6,250 to which should be added the item of expenses above mentioned.

Mr. Eney is requested to draw and submit the appropriate orders for these allowances to himself and Special Master Marbury.

The petition of the Receivers and their Counsel for additional allowances will be considered and determined in a separate opinion of the Virginia Court.